May 31, 2024

Nicholas Chiuchiolo (NChiuchiolo@usa.doj.gov)

Re: United States v. Omar Khan (Case No.: 1:20CR00117-PAE)

### Victim Impact Statement

I want to express my great appreciation to the FBI and the US Attorney's Office for the Southern District of New York for their persistent efforts to bring Omar. Khan to justice even when he fled to Sri Lanka.

Despite the embarrassment and the cost to my reputation, I and the other plaintiffs in this action decided to seek justice against a man who gained our trust and wronged us deeply. Indeed, there remain a number of my friends and colleagues who have too great a fear for the damage to their reputation to speak out against Mr. Khan publicly.

Mr. Khan robbed me of almost $5 million, a significant sum in a complex scam on me, my spouse, and the wine community. Simply repeating this large number does not capture the full scope of Mr. Khan's effect on my life and the lengths to which he went to deceive and take advantage of every person that he meets. Such abhorrent behavior must face grave consequences to deter and punish. A mere two-year sentence will only serve to reward Mr. Khan and demonstrate to him that he can steal many millions of dollars in exchange for a light and delayed sentence. Such is the cold calculus of a man that has left behind a trail of dozens of victims, a decades long pattern of betrayed trust, and a mountain of lies. I attach a copy of the complaint filed in New York Supreme Court upon which I and the other plaintiffs obtained a judgment (also attached) against Mr. Khan that provides only a glimpse of Mr. Khan's fraud. This was one of many lawsuits filed against Mr. Khan.

One of my great passions in life, enjoying wine with friends, has been tainted now by the persistent reminder of how quickly these Mr. Khan's wine dinners got twisted into a large-scale con operation victimizing my friends and colleagues as well as myself. These are people who I can no longer think about without feeling shame and anger about how Mr. Khan preyed upon us.

Unfortunately, Mr. Khan never admitted to any wrongdoing, nor has he shown any signs of remorse since his judgment. Once the authorities and victims began to close in on Mr. Khan, he fled from the United States to Sri Lanka. It was only through information by a long-ago victim of his crimes, who saw him in Colombo, followed him to his hotel and reported his location to our lawyers, that we found out where he was. All this brought up within myself and the other victims feelings of tremendous stress, anxiety, and, quite frankly, anger. And his vigorous fight against

extradition back to the US in order to face justice only intensified these feelings when we learned he was arguing this was a business misunderstanding. He even had tenacity to email several victims including myself from Sri Lanka in January 2023 asking for our "compassion" and "understanding"  - I am attaching his message to myself  so that the Court can see the levels of Khan's obfuscation and manipulation. Indeed, Mr. Khan embodies the classic traits of a sociopath.[1] Now that he has been dragged back, he is getting off far too easy given the scale of his crimes – I understand he is only pleading guilty to Aggravated Identity Theft and agreeing to restitution to the victims in the greater fraud but pleading not guilty to fraud.

The Court should have no doubt that Mr. Khan will continue with his dastardly deeds once he serves his sentence, since that is the only thing he knows how to do and has been doing for his whole adult life. In the name of protection of all new, unsuspecting victims, I ask the Court to impose maximum possible sentence under harshest possible conditions, notwithstanding Khans purported ill health - which, came about by his challenging extradition to the U.S. and wanton spending of funds he stole from his victims and used to finance his life of luxury.

Mr. Khan's harm against me does not start and end with the multimillion-dollar fraud he committed against me and others. It does not end with the judgment certain victims won against him that remains uncollectible because Mr. Khan apparently spent all the money that he stole from his various victims - a number close to USD 10 million - on opulent lifestyle for his spouse and himself. A criminal order of restitution will not bring any tangible justice either. Mr. Khan's lack of shame, his flippant attitude towards very serious allegations of fraud, and his complete disregard for the US judicial system have continued to affect me up to *today*, and I expect these negative feelings to persist for as long as Mr. Khan continues to evade justice.

In addition, my co-plaintiffs listed below in the civil action have confirmed to me and my attorneys that they join in this statement.



---

[1] As described by Lance Dodes, a former assistant clinical professor of psychiatry at Harvard Medical School, "sociopathy is among the most severe mental disturbances." Central to sociopathy is a complete lack of empathy— along with "an absence of guilt." Sociopaths engage in "intentional manipulation, and controlling or even sadistically harming others for personal power or gratification. People with sociopathic traits have a flaw in the basic nature of human beings … They are lacking an essential part of being human." For its part, the DSM-5 states that the "essential feature of antisocial personality disorder is a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood."



Very truly yours,



SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| KRESIMIR PENAVIC, DEAN BERNSTEIN, CHARLES CURTIS, EDWARD KASSELMAN, MARK GOLODETZ, PAUL GRIDLEY, ROBERT VAN BRUGGE, MALCOLM THWAITES, MIRIAM TAI, ROBERT GELFOND, PETER SLAGOWITZ, LORINE SCHAEFER, and JOHN CHAPMAN, | Commercial Division<br><br>Index No.:<br><br>**VERIFIED COMPLAINT** |

Plaintiffs,

-against-

OMAR KHAN, LESLIE KHAN, SENSEI
INTERNATIONAL, LLC, and INTERNATIONAL
BUSINESS & WINE SOCIETY LLC,

Defendants.

Plaintiffs Kresimir Penavic ("Penavic"), Dean Bernstein ("Bernstein"), Charles Curtis ("Curtis"), Edward Kasselman ("Kasselman"), Mark Golodetz ("Golodetz"), Paul Gridley ("Gridley"), Robert Van Brugge ("Van Brugge"), Malcolm Thwaites ("Thwaites"), Miriam Tai ("Tai"), Robert Gelfond ("Gelfond"), Peter Slagowitz ("Slagowitz"), Lorine Schaefer ("Schaefer"), and John Chapman ("Chapman") (collectively, the "Plaintiffs"), by their attorneys, submit this Verified Complaint against Defendants, Omar Khan ("Khan"), Leslie Khan, Sensei International, LLC ("Sensei"), and International Business & Wine Society LLC ("IBWS") (collectively the "Defendants"), and allege as follows:

1

## PRELIMINARY STATEMENT

This action seeks to hold Khan, his wife, and his two companies accountable for their role in orchestrating an affinity fraud[1] in the insular wine enthusiast community whereby Khan defrauded and breached multiple agreements with the Plaintiffs. The Plaintiffs lost over $7 million to Khan in a series of fraudulent "investments" into "business ventures" after Khan failed to return their principal or pay the contractual profit and interest owed to the Plaintiffs, despite Khan's representations that the investments were successful and profitable. As it has now been discovered, most of the "ventures" were in fact not real. Each of the Plaintiffs invested in one or more of these false ventures with Khan, with Plaintiff Penavic suffering the most severe losses of any currently known victims.

## PARTIES

1.      Plaintiff Kresimir Penavic is a resident of New York, New York. He brings this action in his individual capacity.

2.      Plaintiff Dean Bernstein is a resident of Westchester, New York. He brings this action in his individual capacity.

3.      Plaintiff Charles Curtis is a resident of New York, New York. He brings this action in his individual capacity.

---

[1] "Affinity frauds target members of identifiable groups . . . The fraudsters involved in affinity scams often are – or pretend to be – members of the group. They may enlist respected leaders from the group to spread the word about the scheme, convincing them it is legitimate and worthwhile. Many times, those leaders become unwitting victims of the fraud they helped to promote. These scams exploit the trust and friendship that exists in groups of people." https://www.investor.gov/protect-your-investments/fraud/types-fraud/affinity-fraud.

2

Case 1:20-cr-00117-PAE   Document 33-2   Filed 06/04/24   Page 6 of 70

4.      Plaintiff Edward Kasselman is a resident of Monmouth County, New Jersey. He brings this action in his individual capacity.

5.      Plaintiff Mark Golodetz is a resident of New York, New York. He brings this action in his individual capacity.

6.      Plaintiff Paul Gridley is a resident of New York, New York. He brings this action in his individual capacity.

7.      Plaintiff Robert Van Brugge is a resident of New York, New York. He brings this action in his individual capacity.

8.      Plaintiff Malcolm Thwaites is a resident of London, England. He brings this action in his individual capacity.

9.      Plaintiff Miriam Tai is a resident of New York, New York. She brings this action in her individual capacity.

10.     Plaintiff Robert Gelfond is a resident of New York, New York. He brings this action in his individual capacity.

11.     Plaintiff Peter Slagowitz is a resident of New York, New York. He brings this action in his individual capacity.

12.     Plaintiff Lorine Schaefer is a resident of New York, New York. She brings this action in her individual capacity.

13.     Plaintiff John Chapman is a resident of West Hartford, Connecticut. He brings this action in his individual capacity.

14.     Defendant Omar Khan is a resident of New York, New York and a partner of Defendant Sensei International, LLC, a New York Limited Liability Company. Upon information and belief, Khan resides at 111 East 56th Street, Apartment 1200, New York, New York 10022.

3

15.     Defendant Leslie Khan is a resident of New York, New York, and upon information and belief resides at 111 East 56th Street, Apartment 1200, New York, New York 10022 with her husband, Defendant Omar Khan. Defendant Leslie Khan supported Omar Khan's fraudulent scheme by, among other things, corroborating Omar Khan's misrepresentations directly to Penavic and his wife, as well as the other Plaintiffs.  Upon information and belief, Leslie Khan personally benefited from Penavic's "investments" to the detriment of Penavic and the other Plaintiffs.

16.     Defendant Sensei International, LLC is a New York Limited Liability Company with a principal place of business in New York, New York and an address at 445 Park Avenue New York, New York 10022.  Upon information and belief, Khan commingled Sensei funds in his personal bank account and Khan is an alter ego of Sensei.

17.     Defendant International Business & Wine Society LLC is a Delaware Limited Liability Company, with an address and registered agent at 16192 Coastal Highway Lewes, Delaware 19958-9776 and a principal place of business in New York, New York.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the Defendants because the Defendants are domiciled in New York, New York and do business in New York, New York, and because this dispute arises out of agreements that required performance in New York, New York.  Thus, jurisdiction is proper pursuant to CPLR § 301 and CPLR § 302.

19.     Venue is proper under CPLR § 503 as the parties maintain residences and/or their principal places of business in New York, New York and a substantial part of the events or omissions giving rise to the claim occurred in New York, New York.

# FACTS

## Background on Khan

20.     Khan is a partner and founder of Sensei, a management consulting firm headquartered in New York City that claims to "engage[e] human performance to dramatically improve strategic business results."[2]

21.     Khan has strategically curated his image of renowned international success and wealth.  On the Sensei website, he is described as, among other things, "one of the best global consultants and speakers in the world," "a leading innovator," and an "accomplished author and keynote speaker" with a "unique world view."[3]

22.     Khan has been profiled as a "fanatical wine connoisseur," who was disappointed with the wine programs at traditional business networking events.[4]  Khan explained that because he "could not find an event that stimulated his esteemed interests at a high standard," he founded IBWS in 2013.[5]

23.     Khan purported to be reputable internationally in both the fields of business and wine and would invite successful individuals to experience an exclusive opportunity to network while wine tasting.  In attendance at his events were well respected and wealthy members of the wine, business and financial communities.  Upon information and belief, it was at these events and others like it, that Khan selected his "investors," many of who now bring this action against the

---

[2] https://www.sensei-international.com/.

[3] https://www.sensei-international.com/about/sensei-team/omar-khan/; https://www.sensei-international.com/about/sensei-team/omar-khan-speaker-profile/.

[4] Hunter Atkins, *The Elite Supper Club for Business Experts and Wine Fanatics*, FORBES (Jul. 2, 2015), http://www.forbes.com/sites/hunteratkins/2015/07/02/the-elite-supper-club-for-businessexperts-and-wine-fanatics/#f2777f032f83.

[5] *Id*.

5

Defendants.  Upon information and belief, Khan would also source new "investors" by befriending reputable sommeliers who would refer their clients, some of whom are among the Plaintiffs in this action.

### Khan Meets and Befriends Penavic

24.     Penavic is a 54-year-old retired mathematician who spent his career successfully creating algorithms for computer programs in the financial services industry.  Penavic was born in Croatia and emigrated to America as a teenager and attended Stonybrook University, graduating with a degree in advanced mathematics.

25.     Penavic first met Khan in February 2015 through a wine aficionado intermediary. In May 2015, Penavic attended one of Khan's dinners centered around vintage wines and expensive cuisine.  After this first dinner, Khan actively befriended Penavic and over time gained Penavic's confidence and trust.  Unfortunately, Penavic now knows that Khan had picked out his "mark" and that Khan was executing a sophisticated plan to extract funds from Penavic.

26.     Penavic was charmed by Khan, as were all of Khan's marks as set forth below, ostensibly due to Khan's bubbly and worldly personality and passion for vintage wines and expensive cuisine.

27.     Indeed, Khan would engage in a pattern of conduct towards Penavic whereby Khan would provoke Penavic to be excited about certain vintage wines and wine-dinner experiences in order to importune Penavic to be sufficiently interested to invest with Khan but not suspect Khan's nefarious intent.

28.     Khan formalized the wine and dinner experiences into the Business and Wine Society and the International Business and Wine Society ("Business & Wine Events").  Khan held

many Business and Wine Events at fine dining restaurants, including notorious New York City restaurants Eleven Madison, Racines, and Rebelle.

29.     Initially, Khan would charge Penavic $1,500 to $8,500 per event. Sometimes an event could cost as high as $25,000. Soon after his first attendance, Khan began soliciting Penavic to invest his money with Khan to bring this type of "wine and dine" experience to other wealthy individuals.

30.     Khan gradually increased the funds he requested from Penavic. For example, in late May 2015, Penavic paid Khan $2,800 and $6,500 for dinner events.

31.     Khan would often offer rare bottles of wine with large price tags to Penavic and other individuals to be used at the Business & Wine Events. Other victims have brought suit against Khan for his sale of purported rare wines and subsequent failure to deliver any of the bottles that were purchased.[6]

32.     On or around June 26, 2015, Khan approached Penavic for his first major investment. Khan first requested an investment from Penavic of $60,000 for an event that would cost in total $127,600, which Khan described as "an event agreed in London." The event was originally scheduled to occur in four to six months from June 2015 but later changed to occur in February of 2017. Khan offered a 50/50 split of the profits, which he later represented to be $10,000. Khan said that he would cover the rest of the $127,600 investment, the first of many large sums that Khan would arbitrarily decide were needed for each event. Not long after first pitching the opportunity, Khan tweaked his plan in order to extract more from Penavic, explaining

---

[6] *Wallace, et al. v. Khan, et al.* Complaint [ECF 2] (N.Y. Sup. April 23, 2019); *Hotel Beau-Rivage SA v. Khan* Complaint [ECF 2] (N.Y. Sup. May 2, 2018); *Bernard, et al. v. Khan, et al.* Verified Complaint [ECF 1] (N.Y. Sup. Dec. 31, 2018); *Sokrates Partners LLC v. Sensei International, LLC* Complaint [ECF 2] (N.Y. Sup. Feb. 25, 2015); *Sinegal v. Sensei International, LLC, et al.,* 3:19-cv-00101-EDL (N.D. Ca.).

to Penavic that the event would going to be bigger and would cost a bit more, and asked Penavic

to wire $75,000. Penavic never saw any returns from this event and was never returned any of the

$75,000 that he wired. This event never even took place.

33.     Around one month later, Khan then had Penavic "invest" in a second dinner at

Crystal Springs for $75,000 out of total event cost of $123,000. Khan said that he would cover

the rest of the event. The event took place on February 24, 2015, and Khan claimed that there was

only revenue of $67,500. These funds were never returned to Penavic. Instead, Khan proposed to

use the revenue to fund a different further event. This is the only event that Penavic made an

investment in that he knows to have occurred.

34.     On or around July 6, 2015, Khan invited Penavic to join as an investor in IBWS.

Khan said that he "based" the company out of London, England and had two Partners, Lori

Broesamle and Helen Nathan.

35.     However, in an effort to insulate himself from this fraudulent transaction, Khan

explained that the partnership should be memorialized through the formation of a new LLC called

International Business & Wine Society-Global, LLC ("IBWS-GLOBAL"). Penavic wound up

contributing $250,000 for a 37.5% membership interest in IBWS-GLOBAL, which was created

on July 21, 2015. Khan retained a 62.5% membership interest through IBWS and did not

contribute any capital.

36.     Upon information and belief, IBWS-GLOBAL did not conduct any actual business

and was a vehicle of IBWS and Khan to defraud Penavic. Penavic has never received a return on

his investment or a return of his principal. As a result, IBWS violated, inter alia, Sections 6.03(A)

and 6.04 of the IBWS-GLOBAL Operating Agreement by acting in contravention of the Operating

Agreement, making it impossible for the IBWS-GLOBAL to carry on its business, taking acts

without consent of Penavic, and failing to present invoices sufficient to substantiate reimbursement for costs of management of IBWS-GLOBAL.

37.     Lending further credibility to IBWS, Khan claimed to have recruited five prominent individuals to the UK Board of IBWS: Nick Martin (CEO of Wine Owners), Ben Allen (Partner and Co-Founder of Allen and Jain), Marcus Watson (Founder and President of Adoreum), and Tom Harrow (Founder of WineChap).  Khan pitched the idea to Penavic by showing him a detailed report of expenses and profits, marketing materials, and a report of at least twenty successful events organized by IBWS, in New York.

38.     Penavic paid at least $178,400 for wine and dinner events to Khan, which Khan cancelled and never rescheduled.  These events included a "Duos and Trios" dinner in London on June 8, 2018 ($17,000), a "George V" dinner on June 15, 2018 ($24,000), "Three Nights of Wine" on September 20, 22, and 24 in 2018 ($25,000), "Blackberry, Washington and Babette" from October 20 through 27 in 2018 ($80,000), and "Aubert de Villaine" dinner in Paris on November 10, 2017 ($32,400).

39.     Upon information and belief, Khan rebooked some of these events with other attendees, essentially profiting both from the new attendees while not refunding the original attendees.

40.     Khan claimed that he would refund Penavic for the cancelled events but has not done so.

Case 1:20-cr-00117-PAE   Document 33-2   Filed 06/04/24   Page 13 of 70

41.      Khan fraudulently induced and withheld Penavic's principal investments totaling around $4,946,102.  Khan also contracted to pay Penavic $1,007,169.34 in interest[7], and his share in the unpaid profit of $973,340.  To date, Khan owes Penavic at least $6,926,612.

42.      With each of these opportunities, Khan alleged to also invest the same amount or more as Penavic (and with the other Plaintiffs as detailed below). Upon information and belief, Khan never invested his own funds, and kept Penavic's (and the other Plaintiffs') investment for his personal use.  Khan and Sensei signed several agreements with Penavic and the Plaintiffs to organize the Business and Wine Events.  Despite the alleged success of the events, Khan has not returned to the Plaintiffs their principal or paid out the contractual profits for the events.

**Leslie Khan's Involvement**

43.      Very frequently, both Khan and Penavic would be joined by their spouses at the Business & Wine Events.  Upon information and belief, Leslie Khan would also assist Khan to assess the Plaintiffs' wealth and "qualify" them as suitable "investors."

44.      Leslie Khan would join many if not most dinners. Upon information and belief, at those dinners, Leslie Khan would tell attendees that she worked for Sensei. Upon information and belief, Leslie Khan in attending and assisting Khan was fully knowledgeable of Khan's investment scheme and plans to defraud the Plaintiffs.

45.      Upon information and belief, Leslie Khan would also travel with Khan on his trips for wine events and used Plaintiffs' "investments" to fund her global jet setting and luxurious lifestyle.

---

[7] Khan purported that on October 5, 2017 Peter Prescott offered 5% interest per annum, compounded monthly on amount lodged on $5,000,000 to cure his delay in payment, which Penavic accepted.

Case 1:20-cr-00117-PAE   Document 33-2   Filed 06/04/24   Page 14 of 70

46.      Leslie Khan would also accept payment for the Business & Wine Events and investment opportunities on behalf of Khan, and at later dates would also corroborate Khan's excuses for non-payment to the Plaintiffs.

**Losses Suffered by the other Plaintiffs**

47.      *Bernstein.* Bernstein was first introduced to Khan in 2008 through attendance at mutual wine enthusiast experiences.  In February of 2019, Khan approached Bernstein to "invest" $25,000 for a Petrus[8] wine dinner with a profit of 15% split equally.  Upon information and belief, although Khan had already raised the necessary funds for the investment in the Petrus wine dinner, he approached other individuals, in a Ponzi-like scheme to "invest" their funds as well.  On February 26, 2019, Khan signed an agreement personally and on behalf of Sensei to organize the wine and dinner event with promises of return and profit, which to date has not occurred.  Bernstein is owed $28,750 of principal and unpaid profit by Khan and Sensei.

48.      *Curtis.* Curtis was introduced to Khan around 2012 at a dinner centered around business and wine.  Shortly thereafter, Khan invited Curtis to join IBWS and annually contracted Curtis as a consultant to supply wines for his dinner events organized by Khan and IBWS.  Khan failed to pay Curtis back the $5,000 he had agreed to pay him by contract despite Khan's representation that events had occurred and profited.

49.      *Kasselman.* Kasselman was introduced to Khan around 2012 and attended many of his Business and Wine Events.  Around 2018, Khan invited Kasselman to pay $8,000 to attend a Petrus dinner (purportedly the same Petrus event that Bernstein invested in) as a discounted price alongside a list of references including wealthy individuals.  However, Khan cancelled the event,

---

[8] Château Pétrus is a wine estate in Bordeaux, France, that produces some of the world's most expensive wines.

Case 1:20-cr-00117-PAE   Document 33-2   Filed 06/04/24   Page 15 of 70

told Kasselman he would repay him, but after multiple attempts, Khan ceased responding to Kasselman altogether.

50.     *Golodetz.* Golodetz was introduced to Khan around 2013 and noticed his membership in some of the most elite wine clubs in New York. Golodetz, connected to many wine distributors, was often contracted by Khan to help supply wines for his dinner events by purchasing the wines and then reselling them for a pre-agreed upon profit to Khan. Before Golodetz would order more sets of wines for Khan, he had Khan pay him back for his previous events. Frequently, in lieu of paying Golodetz with cash, Khan would instead offer spots at IBWS dinners. Golodetz invested in a few opportunities with Khan (such as the Petrus dinner) and is still owed $6,800 in interest that Khan had agreed to pay him.

51.     *Gridley.* Gridley was introduced to Khan around 2014 and has since attended many of the Business and Wine events organized by Khan. Over the past 4 years, Gridley invested many times with Khan, and Khan promised Gridley 15% returns of his principal split equally between them. Although Khan has paid Gridley back for some of his investments across the five agreements they have executed, Khan has failed to return to Gridley his remaining $95,090 in principal and profits as Khan agreed in their contracts.

52.     *Van Brugge.* Van Brugge was introduced to Khan around 2014 and has since attended many of Khan's Business and Wine Events. Van Brugge invested numerous times with Khan and was only paid back on his principal of $29,500 from one cancelled dinner. Khan alleged that each of the other dinners occurred, and that Van Brugge would receive roughly 15% of the profits. However, Khan has failed to pay back Van Brugge for the remaining $235,750 of principal and profit he was owed by Khan across five contracts.

53.     *Thwaites.*  Thwaites was introduced to Khan in 2015 and has since attended many of Khan's Business and Wine Events.  Khan approached Thwaites to join IBWS and invest $143,000 in business opportunities, which Thwaites paid.  $86,000 of the $143,000 was paid for dinner events that Khan cancelled or did not schedule.  $57,000 was paid for a dinner that did occur but the principle and profit of $10,000 was not paid to Thwaites.  Despite the alleged success of the events, and required performance on the contracts, Khan never paid Thwaites his principal of 143,000 or profit of $10,000.

54.     *Tai.*  Tai was introduced to Khan in 2016, and after attending one wine and dinner event, Khan invited her to join as a member of IBWS in January 2017.  Over a series of correspondences and misrepresentations, Khan had Tai invest in future events promising roughly 15% return on the profits to be split either equally or 60/40 between Khan and Tai respectively. Khan and Sensei signed several agreements to organize wine and dinner events under the terms described above.  Despite the alleged success of the events, and required performance under the contracts, Khan has never returned Tai's $312,625 of her principal and profit.

55.     *Gelfond.*  Gelfond was introduced to Khan in March 2017.  After attending several dinner events, Khan had Gelfond invest in an opportunity with a proposed 10% to 20% profit split equally, with the assurance from Khan that all the funds would remain in the Sensei bank account.  Despite the contract between them, Khan has to date only returned $45,000 to Gelfond, leaving unpaid Gelfond's principal, unpaid profit, and agreed interest[9] totaling $353,750.  Additionally, Gelfond paid $36,000 for two seats for a dinner that was cancelled and never rescheduled and never refunded, bringing the total amount owed to Gelfond, $389,750.

---

[9] Khan purported that Peter Prescott offered 5% interest on $300,000 to cure his delay in payment, which Gelfond accepted.

56.     *Slagowitz.*  Slagowitz was introduced to Khan around 2017 and attended many of Khan's Business and Wine Events.  Slagowitz invested in two dinner events, which Khan alleged occurred and profited.  The two contracts provided that Slagowitz had the option to use his investments as credit towards future events.  For the first dinner, Slagowitz exercised the option to use the credit towards another event. However, Slagowitz did not exercise that option for the second event.  Instead of paying Slagowitz, Khan delayed repayment of his principle and 14% profit and attempted to convince Slagowitz to invest in another event.  In a desperate attempt to deter Slagowitz from filing this action, Khan paid Slagowitz $5,000 and said he would continue to pay him.  Khan has failed to pay Slagowitz $57,700 of principal and profit as required by their contract.

57.     *Schaefer.*  Schaefer was introduced to Khan in 2018 by a sommelier for the purpose of exploring investment opportunities with Khan.  Before she even attended events held by Khan, Schaefer was approached by Khan to invest $36,050 in a future event at a restaurant named Craft in New York for an estimated profit of $13,500 to be split equally. Khan also had others like Chapman invest in the dinner at Craft, essentially doubling up on his investments.  On December 20, 2018, Khan signed an agreement personally and on behalf of Sensei to organize a wine and dinner event under the terms described above, which he provided to Schaefer.  Schaefer countersigned the agreement, sent it to Khan, and paid the funds to Sensei as required under the agreement.  Despite repeated requests, Khan never sent Schaefer a copy of the countersigned agreement.  In March 2019, Khan hosted the event, which was well attended and appeared to have been profitable.  Nonetheless, Khan has refused to return Schaefer her principal or profit of $42,800.

14

58. *Chapman*. Chapman was introduced to Khan in late 2018 and shortly thereafter, was invited to attend a Business and Wine Event. After attending, Khan approached Chapman to join IBWS and invest in a venture for at least $57,200 with the projected profit of $11,440 to be split equally. Despite Chapman's performance, and the alleged success of the event, Khan has never returned Chapman his principal or profit of $62,920.

59. Although IBWS appeared to be legitimate, Khan used IBWS as a platform to "pick his mark" for new wealthy individuals to "invest" in his fraudulent ventures.

60. Upon information and belief, in an effort to continue the fraudulent schemes as described above, Khan offered these agreements and promissory notes purporting to use the allocated funds for investments with promises of returns. Khan never intended on returning these funds. Instead, he retained the funds for his personal use.

61. The agreements Khan proposed and fully executed with the Plaintiffs are detailed in the chart below[10]:

| Date | Plaintiff | Defendant | Amount Paid By Plaintiff |
|---|---|---|---|
| August 5, 2015 | Penavic | Khan, IBWS | $250,000 |
| August 29, 2016 | Penavic | Khan | $350,000 |
| December 30, 2016 | Penavic | Khan | N/A |
| July 21, 2015 | Penavic | Khan | $125,000 |
| February 4, 2016 | Penavic | Khan | $75,000 |
| March 28, 2016 | Penavic | Khan | $240,000 |
| June 8, 2016 | Penavic | Khan | $540,000 |
| May 30, 2017 | Penavic | Khan, Sensei | $2,887,702 |
| May 30, 2017 | Penavic | Khan, Sensei | $1,040,000 |

[10] The amounts paid here do not reflect the total paid out by each Plaintiff. Instead, in an effort to maintain the appearance of a dedication to repay the Plaintiffs, Khan would acknowledge various cumulative amounts of money paid. However, he has failed to completely pay back the Plaintiffs as he agreed to in these agreements. See Schedule 1 for a chart showing each Plaintiff's unpaid principal, interest, and profit.

15

Case 1:20-cr-00117-PAE   Document 33-2   Filed 06/04/24   Page 19 of 70

| Date | Plaintiff | Defendant | Amount Paid By Plaintiff |
|---|---|---|---|
| August 16, 2017 | Penavic | Khan, Sensei | $1,500,000 |
| March 9, 2018 | Penavic | Khan, Sensei | $2,900,000 |
| February 26, 2019 | Bernstein | Khan, Sensei | $25,000 |
| February 9, 2019 | Curtis | Khan, IBWS | $5,000[11] |
| March 17, 2019 | Kasselman | Khan, Sensei | $8,000 |
| July 2018 | Golodetz | Khan | $6,800[12] |
| April 4, 2017 | Gridley | Khan, Sensei | $25,000 |
| March 7, 2018 | Gridley | Khan, Sensei | $50,000 |
| November 27, 2018 | Gridley | Khan, Sensei | $25,000 |
| February 26, 2019 | Gridley | Khan, Sensei | $28,750 |
| March 20, 2019 | Gridley | Khan, Sensei | $16,000 |
| April 18, 2018 | Van Brugge | Khan, Sensei | $69,000 |
| April 27, 2018 | Van Brugge | Khan, Sensei | $65,000 |
| May 15, 2018 | Van Brugge | Khan, Sensei | $32,500 |
| May 15, 2018 | Van Brugge | Khan, Sensei | $35,000 |
| August 29, 2018 | Van Brugge | Khan, Sensei | $45,000 |
| September 19, 2108 | Thwaites | Khan, Sensei | $45,000 |
| October 15, 2018 | Thwaites | Khan, Sensei | $57,000 |
| December 16, 2017 | Tai | Khan, Sensei | $40,000 |
| January 11, 2018 | Tai | Khan, Sensei | $27,500 |
| March 6, 2018 | Tai | Khan, Sensei | $48,000 |
| March 12, 2018 | Tai | Khan, Sensei | $60,000 |
| April 9, 2018 | Tai | Khan, Sensei | $75,000 |
| April 18, 2018 | Tai | Khan, Sensei | $50,000 |
| May 15, 2018 | Tai | Khan, Sensei | $35,000 |
| August 10, 2017 | Gelfond | Khan, Sensei | $250,000 |
| September 18, 2017 | Gelfond | Khan, Sensei | $75,000 |
| February 12, 2018 | Slagowitz | Khan, Sensei | $55,000 |
| December 20, 2018 | Schaefer | Khan, Sensei | $36,050 |
| December 12, 2018 | Chapman | Khan, Sensei | $57,200 |

[11] This is an amount owed to Curtis for consulting and wine sourcing.

[12] This is an amount owed to Golodetz only for unpaid interest.

62.     Khan has breached each of the above agreements as discussed above and owes Plaintiffs at least $6,166,852 of principal.

**Khan Continues to Defraud Penavic in at least 23 "Ventures"**

63.     Using the Business and Wine Events platform and scheme, Khan had Penavic invest in "ventures" by making intentionally false and misleading promises, with a preconceived and undisclosed intention not to perform his promises.

64.     Through a series of meetings and correspondences, Khan pitched Penavic on the business "opportunity" of bringing these wine and dinner experiences to cities around the world such as in Hong Kong, Bordeaux, London and Singapore.  For each "venture," Khan required Penavic to invest funds before the event occurred.  Khan claimed that the event attendees or sponsor would not pay in advance, so he and Penavic needed to cover the costs, which Khan would arbitrarily manufacture.  Upon information and belief, this was a pretext for Khan to request additional funds from Penavic.

65.     For each of these ventures, Khan deliberately left out material identifying information so that Penavic had to rely upon Khan's representations with no way to verify the events.  Penavic never received any evidence that any of these "ventures" occurred, let alone received any return of his funds despite his requests.

66.     Khan would have Penavic wire him the funds personally or to his Sensei account and would claim that he would also invest in the venture.  Then, using the proposed profits from "successful events" Khan would "roll in" those funds into various other "investments," obfuscating and complicating the investment schemes.[13]  However, upon information and belief, Khan never

---

[13] Khan would use the word "pour" and "roll in" to describe the use of funds from a prior investment for a new investment.  This was a tactic used by Khan throughout the scam to delay the return of Penavic's funds.

actually put any of his own money into any of these "ventures" and they were almost all fabricated.[14]

67.      Khan lured Penavic to join Khan in at least 27 of the "ventures" that guaranteed dates for financial returns to be provided.  Khan fraudulently induced Penavic to invest at least $3,118,702.  Khan would allege that these opportunities provided "upsides" of 15% to 20%. Unless stated otherwise, Khan and Penavic agree to split the profits.  From the start, Khan never intended to return Penavic's funds.  Despite the alleged success of each "venture" or event, Penavic never received a return on his investments.  Upon information and belief, the events never occurred.

68.      The "ventures" are detailed in the chart below:

| Date | Proposed Venture Opportunity | Funds Paid By Penavic | Total Investment by Penavic & Khan | Unpaid Profit Owed by Khan |
|---|---|---|---|---|
| June 26, 2015 | First venture *supra* ¶33. | $75,000 | $127,600 | $5,000.00 |
| July 7, 2015 | Second venture *supra* ¶34. | $75,000 | $123,000 | No purported profit |
| July, 2015 | *IBWS.*  Opportunity to join IBWS *supra* ¶35. | $250,000 | $250,000 | 15% buy in into "the market" |
| July 20, 2015 | *Hong Kong I.*  Khan proposed a series of ten dinners for prominent Chinese wine collectors. | $175,000 | $300,000 | $7,500.00 |
| February 19, 2016 | *Hong Kong II.*  Khan proposed a "a corporate gig in HK for Shui On Properties" and their principal Vincent Lo. | $111,000 | $185,000 | $13,875.00 |
| December 14, 2017 | *Three Dinners.*  Khan proposed a series of dinners for "long-term Sensei client, out of Hong Kong" called "European Wine Dinner, UK Wine Dinner, and the Third Dinner." | $75,000, $70,200, $90,000 | $115,000, $117,000, $150,000 | Never occurred, $8,775.00, $11,250.00 |

---

[14] Upon information and belief, only one event of those Khan proposed to Penavic was actually occurred, Khan's second venture *supra* ¶34, which net a loss which Khan shared.

| Date | Proposed Venture Opportunity | Funds Paid By Penavic | Total Investment by Penavic & Khan | Unpaid Profit Owed by Khan |
|------|------------------------------|----------------------|-----------------------------------|----------------------------|
| December 14, 2017 | *Paris Wine Dinner*. Omar alleged to have one other collection of wines, which he saved for a wine dinner in Paris. | $156,000 | $260,000 | $15,000.00 |
| September 3, 2015 | *Nick Martin*. Khan proposed a venture for a man named Nick Martin, "founder of the online platform Wine Owners" | $50,000 | $100,000 | $18,000.00 |
| September 3, 2015 | *Cunard I*. Khan proposed venture with a company named Cunard to produce an event in the United Kingdom for their "world cruisers" and "high rollers." | $7,500 | $15,000 | $8,750.00 |
| February 12, 2016 | *Cunard II*. Khan proposed a second deal with Cunard that he claimed would bring 50 new members into IBWSLLC. | $108,000 | $270,000 | N/A |
| November 3, 2016 | *Unilever*. Khan proposed a deal with Michel Dallemagne who Khan claimed was "formal global Head of Hair Category in Unilever." | $360,000 | $600,000 | $100,000.00 |
| December 21, 2016 | *Novartis I*. Khan proposed a venture for 60 of Novartis' "stakeholders, leaders, and contributors" in late January of that year. | $226,000 | $440,000 | $27,500.00 |
| March 12, 2017 | *Novartis II*. Khan alleged that Novartis requested funds for a new event. | $90,000 | $150,000 | $15,000.00 |
| August 9, 2017 | *Novartis III*. Khan represented to Penavic that "Novartis wants to proceed on the next round." | $90,000 | $150,000 | $15,000.00 |
| January 14, 2016 | *SGC Wines & Arnaud*. Khan proposed a deal with a company named SGC Wines and "their principal" Arnaud for an event "in LA ahead of the Academy Awards." | $42,000 | $70,000 | $5,000.00 |
| February 26, 2016 | *Neal Martin and Silvio Denz*. Khan proposed a venture set up by "his friend" Neal Martin with a man named Silvio Denz, owner of Lalique to produce a series of "Pomerol" events. | $65,252 | $177,920 | $21,040.00 |
| January 22, 2016 | *1234 Society I*. Khan claimed that Berenad Hervet offered Khan access to Clos de Vougeot, a wine château and the | $1,900 | $45,000 | N/A |

| Date | Proposed Venture Opportunity | Funds Paid By Penavic | Total Investment by Penavic & Khan | Unpaid Profit Owed by Khan |
|---|---|---|---|---|
| | private 1234 Society in Burgundy, France to purchase two memberships into the society and to attend the society's events. | | | |
| November 29, 2016 | *1234 Society II.* Khan alleged that Clos de Vougeot wanted to run an event. Khan also alleged that the event would bring in more members for IBWSLLC. | $13,750 | $27,500 | $1,900.00 |
| April 14, 2016 | *Coravin.* Khan proposed a dinner with his "pal" Greg Lambrecht who Khan alleged is an owner of a company named Coravin. | $90,000 | $150,000 | $7,500.00 |
| May 11, 2016 | *Latour Club.* Khan proposed a venture with François-Henri Pinault "the owner of Latour" for the opening of the Latour club in the new Four Seasons Hotel in London, Ten Trinity. | $86,100 | $141,700 | N/A |
| January 17, 2017 | *Singapore.* Khan proposed a series of dinners for a man named Rajiv and "his guys in April in Singapore." | $100,000 | $100,000 | $10,000.00 |
| May 1, 2017 | *Oxford.* Khan fraudulently proposed a "venture" with his alma mater Oxford University, Sir Ivor Crewe –the Master of the College, and Daniel Rose. | $150,000 | $250,000 | $12,500.00 |
| February 16, 2017 | *California Musicians I.* Khan proposed a venture with the "musician crowd in LA." | $120,000 | $200,000 | $20,000.00 |
| March 2, 2017 | *California Musicians II.* Khan proposed a second venture to provide a dinner for these musicians. | $51,000 | $85,000 | $8,500.00 |
| March 6, 2018 | *Royal Bank of Scotland.* Khan proposed a venture with the Royal Bank of Scotland to set up a series of "sessions." | $390,000 | $650,000 | $48,750.00 |
| TOTAL | N/A | $3,118,702.00 | $5,249,720.00 | $1,028,930.00 |

## Major Investment Scheme

69.     Khan held himself out to be internationally reputable in both the fields of business and wine and used his "connections" to create major investment opportunities with public figures such as Daniel Rose, Philippe Rothschild, Peter Prescott, and others.  Khan was never able to confirm any real contact with these individuals beyond his bare allegations.  Moreover, it appears as though Khan has actually manufactured the only evidence he has of any deal whatsoever, which was an email coming from Philippe Rothschild's office who is the owner of a well-established winery named Mouton.

70.     In order to monitor Khan, in 2016 Penavic created a C-Corporation named "Pierian Spring Inc" that was owned equally by Penavic and Khan.  Penavic and Khan agreed to use the account for the investments so Penavic could monitor the purported cash flows.

71.     Upon information and belief, Khan never actually invested any money into any of these deals.  In fact, no money ever reached a Pierian Spring bank account.  Instead, Khan used the account as another impediment to receive "incoming funds."  For example, funds would allegedly be paid into Khan's Sensei account, and Khan would have trouble completing the transfer into the Pierian Spring account.

### _Daniel Rose_

72.     Khan employed elaborate stories, often relying on wealthy "old friends" or family associations to establish the credibility and security of his "investment opportunities."

73.     Rose would occasionally attend Khan's dinner events and Khan would publicly boast of their close relationship.  Rose was one of many wealthy and successful individuals invited

21

to Khan's dinners, and Khan would use the appearance of close connections to these individuals to convince the Plaintiffs of the legitimacy of their "investments."

74.     Khan approached Penavic, boasting of their relationship, to participate in an "opportunity" by investing in a dinner event for Rose's retirement.  Knowing of their close familial bond, Penavic was tricked by Khan into believing that Rose was actually involved in their "investments." However, from the beginning, Rose was never involved in any investments with Khan, and Khan would just keep the funds for his personal use.

75.     Khan used high pressure tactics to ensure Penavic continued "investing."  For example, on or about May 26, 2017 Khan told Penavic, "I would hate to lose this, which I have to act on it if we are to do it." Reinforcing the pressure, on May 27, 2017, Khan convinced Penavic to wire $396,000 for a retirement party out of purported $660,000 cost, guaranteeing him a $700,000 return principle and profit by October 2017, at the latest. Penavic sent the funds but never received his principal or a return on his investment.

76.     Instead, as he did with a large majority of the funds from other "investments," Khan "rolled in" the received principal and profits into other funds in a Ponzi-like scheme.  Khan alleged that the Rose funds included rollovers from investments with Unilever, Singapore, the Musicians, Novartis, the Oxford event, and Hong Kong investments (together totaling $1,667,000). Khan alleged to have profited $700,000 from the event. Penavic has not been paid his $350,000 of profit.

77.     Thus, the Rose funds totaled $2,327,000 ("Rose Funds").  Upon information and belief, these events never actually occurred, and thus the "profit" Khan alleges was entirely fabricated.

78.     Daniel Rose has confirmed that he is a close family friend of Khan but denies having ever invested with Khan or having ever made any financial dealings with Khan.  Rose is

Case 1:20-cr-00117-PAE   Document 33-2   Filed 06/04/24   Page 26 of 70

another one of the many victims of Khan's fraud. It is evident that Khan completely and blatantly fabricated the "investments" made with Rose and instead kept the funds for his and Leslie's personal use.

**Peter Prescott**

79.     In 2017, Khan claimed to allocate the millions of dollars that Penavic had invested and "profited" with Rose into another fund involving a real estate mogul and "hotelier" named Peter Prescott ("Prescott"), who Khan claimed is an active board member of Mouton.

80.     On or around August 9, 2017, Khan represented to Penavic that Prescott was interested in a major event with Khan. That same day, Khan relayed "an offer from Prescott" requiring them to place $5 million in an account, pay $880,000 now, and earn $300,000 in September without "having money at risk." Unfortunately, this was not true and was part of Khan's scheme to perpetuate a further fraud against Penavic.

81.      Penavic explained his reluctance to Khan that he had already invested a substantial amount in Khan's various "ventures" and rejected the offer. Khan persisted and said that he would "invest $880,000" of his own funds, if Penavic agreed to "roll over" the $2,327,000 from the Rose Funds and the $180,000 from Novartis II ($150,000 investment plus $30,000 "profit"). In other words, Khan suggested Penavic earmark $2,507,000 of his other investments in this opportunity. Then, Khan claimed to move $1,613,000 from "Sensei" plus the $880,000 that "he contributed" to satisfy the $5 million requirement for the Prescott investment. Unfortunately, the amounts supposedly transferred were wholly fictitious and designed by Khan to perpetuate the fraudulent scheme.

82.     Khan alleged the Prescott event profited $360,000 but has still failed to repay Penavic his share of $180,000.

23

Case 1:20-cr-00117-PAE   Document 33-2   Filed 06/04/24   Page 27 of 70

83.     On August 16, 2017, Khan sensed Penavic's growing uneasiness about the enormous and growing sum he had paid to Khan without any funds returned.  As an assurance to Penavic and to cure the non-payment, Khan agreed to transfer  Penavic $1,500,000 by September 15, 2017, in "partial payment of the investment made by Mr. Penavic" of $2,887,702"[15] as outlined by the note from 5/30/2017 or interest will start accruing from October 1, 2017, at a rate of 5% per annum compounded monthly.  This Promissory Note was signed and notarized on August 16, 2017.  Penavic never received the $1.5 million or the interest due.

84.     The total amount making up the investments with Prescott is $5,000,000 ("Prescott Funds").

85.     On or about October 5, 2017, Khan did not process Prescott's payment or transfer Penavic his $1.5 million plus interest.  Instead, Khan claimed that Prescott had changed their agreed terms and asked that they run another event for Prescott and the Mouton winery, claiming Prescott was on the board of Mouton, and that Prescott would give him a $60,000 profit.   Penavic rebuffed Khan and requested a transfer of his funds.  Penavic never received these funds despite his repeated requests and demands.

86.     Frustrated with non-payment and still under the impression that Khan was dealing with him honestly, Penavic pushed Khan to pressure Prescott to pay.  In response, Khan claimed that Prescott would pay interest for the late payment.  On January 11, 2018, Khan claimed they finally received $5,360,000 ($5,000,000 plus $360,000 profit) from Prescott into his "UK account" but without the interest due.  However, Penavic never received these funds because Khan convinced Penavic to include those funds in the below campaign with Mouton.  Unfortunately,

---

[15] Penavic's investment was greater than this amount but he was reassured by Khan's representation that he intended to pay.

this was all a ruse and part of Khan's scheme to delay the inevitable – Penavic's realization that

he had been duped by Khan and that Khan would never return his "investments."

**The Mouton Scheme**

87.     In order to avoid paying Penavic back the funds that he had invested with Prescott,

Khan began a campaign of more elaborate lies involving a French vineyard named Château

Mouton Rothschild ("Mouton"), run by Philippe Rothschild, located in Bordeaux, France (the

"Mouton Investment").

88.     Eventually, through a complex scheme involving a new consulting deal and "the

IRS," Khan used the Mouton Investment to tie up *all* of the invested funds with Mouton (including

Bordeaux Club) and Prescott (including the Rose funds).

89.     Beginning in July 2015, Khan introduced the "Bordeaux Club" as an exclusive club

and solicited hundreds of thousands of dollars from Penavic guaranteeing immediately foreseeable

earnings on his investments.   Khan falsely claimed that Mouton and another prominent wine

Chateau named Petrus were interested in the concept.

90.     As an initial investment, Khan had Penavic wire $125,000 of $200,000 for a 25%

interest in the Bordeaux Club.   For Khan's investment, he claimed to invest $50,000 and also

waived his $250,000 consulting fee.   An agreement was signed commemorating the Bordeaux

Club investments on July 21, 2015.   Then, in February 2016, Khan had Penavic increase his

investment by $75,000.   The agreement dated February 4, 2016 acknowledges the payment, and

purpose of the payment.

91.     In March 2016, Khan asked Penavic for a new investment with Mouton's president

Phillipe Dhalluin.   The investment required Khan and Penavic to "park" $400,000 to show that

they were viable partners with funds available.   Unfortunately, the concept of a "park" was a fiction

25

Case 1:20-cr-00117-PAE   Document 33-2   Filed 06/04/24   Page 29 of 70

designed by Khan to siphon more funds from Penavic without the appearance of any risk as Khan represented that the "park" functioned similar to an escrow account. Khan had Penavic wire him $240,000 as a "short-term loan" for the Mouton Park, with Khan's "investments" making up the rest of the $400,000 total.

92.     On March 28, 2016, Khan signed an agreement acknowledging Penavic's payment as part of "the presentation made to Baron Mouton Rothschild." This also appears to have been a complete fabrication with Khan pocketing the $240,000.

93.     Then in June 2016, purportedly returning from a meeting with Mouton's executives, Khan proposed a new joint investment of $1.5 million beyond the $440,000 Penavic already put into Mouton (at this point, Khan merged the "Bordeaux Club" and Mouton into one venture). Khan then had Penavic wire $300,000 as part of a "park" for Mouton. Khan claimed to invest $200,000, and "roll in" $290,500 from Cunard, $45,000 from Hong Kong, and $200,000 from Neal Martin (that funds from Crystal Springs was rolled into). On June 8, 2016, Khan and Penavic signed an agreement acknowledging the increased investments. However, Khan never returned Penavic's principal or investment profit.

94.     Khan soon had Penavic wire an additional $300,000 for as additional "park" for Mouton.

95.     Over the next two years, Khan scammed or attempted to scam Penavic to further invest into four more "opportunities" relating to Mouton, with guaranteed and immediate returns on set dates. These dates all came and went with Khan lying about the reasons for his failure to pay Penavic anything.

Case 1:20-cr-00117-PAE   Document 33-2   Filed 06/04/24   Page 30 of 70

96.      First, on August 9, 2017, Khan presented a venture with Prescott acknowledging Prescott as a "key" player on Mouton's board, where Khan has Penavic "roll in" several million dollars.

97.      Second, on October 5, 2017, instead of presenting payment of the Prescott Funds, Khan alleged that Prescott requested that they instead run an event for both Prescott and Mouton.

98.      Third, in March 2017, Khan asked Penavic to increase his investment with Mouton for an investment called "Club of 8" that would require $840,000 with a promised return of the principal and profit of $125,000 in at most 90 days from signing.

99.      Penavic was pressured to do the deal that day or risk losing the opportunity and relationship.  Khan often expressed this urgency, stressing the necessity of getting the deal done as quickly as possible, or risk losing the deal completely.

100.     Although Khan alleged that that the event profited $125,000, Penavic was not paid his profit of $62,500 for the investment into "Club of 8."

101.     According to Khan, the previous funds "invested" in Mouton totaled around $1.5 million (including direct investments and "rolled in" funds) were placed into a "park" which was "equivalent to an escrow account" and would have to remain untouched.  Khan lied once again to Penavic saying that he will receive the funds "within 90 days of contracting."  Using this deception of holding Penavic's funds in secure "parks," Khan had Penavic wire $213,000 for Club of 8. Khan claimed to invest $142,000 and, then "rolled in" $495,000 from Novartis I ($440,000 and $50,000 in profit) to make the total.

102.     On or around August 9, 2017, again to cure his non-payment and delay, Khan executed two Promissory Notes dated May 30, 2017, acknowledging that Penavic contributed $2,887,702 to other investments and then an additional $1,040,000 for the Mouton Park (this

included $200,000 from Bordeaux, and the three additional Mouton park payments of $240,000, $300,000 and $300,000).  Khan claimed Prescott would pay by September 15, 2017.

103.     Fourth, on June 11, 2018, Khan claimed that Mouton requested a concept dinner that required $190,000 to run.  Khan continuously followed up and asked for a range of different sums.  However, Penavic, refused to send Khan additional funds.

104.     At this point, Penavic directly invested $1,253,000 with Mouton.  The amount rolled into the Mouton investment from other investments totaled $1,030,500.  At this point, all investments made with Mouton totaled $2,283,500 ("Mouton Funds").

105.     Penavic constantly requested Khan to pay his principal and profits that he put into the Mouton Funds.  However, Penavic received nothing but Khan's litany of excuses and false assurances.

106.     For the next few months, Khan derailed discussion of payment by hosting several "wine and dine" experiences, and in August of 2017, introduced the fact that Mouton's lawyers would need to deal with some "legal volleying" in order to create a new contract for payment into the Pierian account.

107.     Khan used this fabricated discussion of negotiation of the contract for payment to mislead Penavic into believing that there was actual progress with payment.

**Pooling and Obfuscation of Funds**

108.     Beginning his most outrageous scheme, Khan entangled the Prescott Funds and the Mouton Funds (including the Rose Funds and multiple "roll ins") into a large consulting deal. In doing so, Khan had Penavic "invest" around $5,000,000 "with" both Mouton and Prescott.  Khan's likely purpose was to bottleneck the sprawling series of "investments" into a one transaction to perpetuate and simplify the fraudulent scheme.

109.     Khan introduced this consulting deal as a major opportunity to open a New York

club run backed by Mouton and a major shareholder called "67 Pall Mall." As a requirement of

the deal, Khan conveniently claimed that it was necessary "to keep all the funds in Sensei account

in order to land the second deal from Mouton."

110.     For several months, Khan detailed the negotiations and drafting of the contract with

Mouton to secure the deal. Then, once the deal seemed near closing, in a subsequent campaign to

delay payment of the "pending" funds, Khan made excuses and complained about the bureaucracy

and mishandling of the payment by Mouton and used this lie to delay payment to Penavic for

another full year.

111.     However, abruptly, on March 19, 2018, Khan told Penavic that "We were ready to

begin transfer process" then in "an act of legal paranoia" .... they had to return to Mouton and "yell

bloody murder and do some first-class legal saber rattling."

112.     A few months later, Khan claimed that the money "was on the move" but the very

next day lied that the Internal Revenue Service ("IRS") had placed a lien on his Sensei account for

unrelated account activity in Dubai, which later required "an auditor" to fly out there and settle the

dispute.

113.     Khan also forwarded Penavic an email from his "accountant," Franz Michael

Walter, regarding the IRS "lien."[16] Khan then explained that "We have now litigated damages"

against the IRS. Alarmed, Penavic tried to gain information on the lawsuit such as public case

identifying information. Khan denied his request initially saying said his "Partners" wouldn't let

him share the information with "third parties." Then later, Khan changed his story and said that

he was only "threating litigation" against the IRS.

---

[16] It is unclear if this was an authentic email or Khan impersonated Franz Michael Walter.

Case 1:20-cr-00117-PAE   Document 33-2   Filed 06/04/24   Page 33 of 70

114.     Penavic then pushed to connect his lawyer with Khan's, as it was his money on the line, but Khan conveniently explained that the IRS matter will likely be resolved by an auditor in Dubai.

115.     Simultaneous to the "IRS lawsuit," placing another obviously fabricated obstacle upon repayment, Khan explained that the Mouton major consulting deal took several steps backwards.

116.     For the second half of 2018, Khan continuously lied to Penavic in emails detailing the painstaking negotiations with Mouton and the IRS, which he explained was significantly stalled by the sudden death of his personal accountant who had the passwords to key accounts. Upon information and belief, the accountant did not manage any international bank accounts for Khan and any account that the accountant had access to was provided by Khan.

117.     From 2018 through 2019, Khan's communication with Penavic became scarce.  The frequency of emails dropped from several each day to once every month.

118.     In his last correspondences, Khan did not give any resolution or update on the negotiations but only begged Penavic to loan him money as he alleged that his funds have run dry. He tried one last venture, trying to sell Penavic $130,000 worth of wine.  Khan claimed that the loan he requested from Penavic, will "help [him] literally 'survive' the next fortnight."

119.     Essentially, most if not all of the funds Penavic invested were tied up in this Mouton and IRS fabrication.  Khan fraudulently induced and withheld Penavic's money totaling at least $6.4 million.

**COUNT ONE**
**Breach of Contract**
**(Kresimir Penavic Against Omar Khan, Sensei International LLC, and International Business & Wine Society LLC)**

30

Case 1:20-cr-00117-PAE   Document 33-2   Filed 06/04/24   Page 34 of 70

120.    Plaintiff Penavic hereby repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

121.    The agreements constituted legal and binding contracts between Defendants Khan, Sensei, and International Business & Wine Society LLC with Penavic.

122.    The agreements called for payment and performance and Defendants Khan, Sensei, and International Business & Wine Society LLC have failed to make payments as called for therein.

123.    Penavic has fully performed his obligations under the agreements listed below in addition to all other agreements discussed below with Defendants Khan, Sensei, and International Business & Wine Society LLC.

124.    Defendants Khan, Sensei, and International Business & Wine Society LLC have materially breached their agreements by failing to pay Penavic his principal, profit, and interest.

125.    Defendant International Business & Wine Society LLC violated Sections 6.03(A) and 6.04 of the IBWS-GLOBAL Operating Agreement by acting in contravention of the Operating Agreement, making it impossible for the IBWS-GLOBAL to carry on its business, taking acts without consent of Penavic, and failing to present invoices sufficient to substantiate reimbursement for costs of management of IBWS-GLOBAL.

126.    Khan has materially breached the agreement dated July 21, 2015 by violating the clause that "The funds invested will be utilized expressly as per the activities agreed and indicated in the budget discussed and agreed between the parties."  Khan did not use the funds as agreed upon by the parties.  Instead of investing the frauds with Mouton, he kept the funds for his own personal use.

127.     Khan has materially breached the agreement dated February 4, 2016, where Penavic paid an additional $75,000 to be "utilized expressly as per the activities agreed and indicated in the budget discussed and agreed between the parties." Khan did not use the funds as agreed upon by the parties.  Instead of investing the frauds with Mouton, he kept the funds for his own personal use.

128.     Khan has materially breached the agreement dated March 28, 2016 by failing to repay Penavic $240,000 "after that meeting [with Rothschild] and any agreement emerging from it is concluded, estimated to be just after the first week of May."  Khan alleged the meeting occurred, but Penavic never received the funds.

129.     Khan has materially breached the agreement dated June 8, 2016, by failing to repay Penavic $540,000 "after the signing of the agreement forecasted for September 15, 2016."  Khan alleged that the agreement was signed, but never transferred the funds back to Penavic.

130.     Sensei and Khan have materially breached the promissory note dated May 30, 2017 by failing to repay Penavic $2,887,702 after "time-tables [are] discussed and agreed by parties".

131.     Sensei and Khan have materially breached the promissory note dated May 30, 2017, by failing to pay Penavic $1,040,000 of the investments he made into Mouton park.

132.     Sensei and Khan have materially breached the promissory note dated August 16, 2017 by failing to pay Penavic $1,500,000 by September 15, 2017 and the interest due on that amount that began accruing on October 1, 2017 at a rate of 5% per annum compounded monthly.

133.     Sensei and Khan have materially breached the promissory note dated March 9, 2018 by failing to pay Penavic $2,900,00 by April 9, 2018 and the interest that began accruing on after that date at a rate of 8% per annum compounded monthly.

134.   Penavic has suffered damages as a result of Defendants Khan, Sensei, and International Business & Wine Society LLC's material breaches.

135.   As a result, Defendants Khan, Sensei, and International Business & Wine Society LLC are liable in an amount to be determined at trial, but no less than $6,926,612.

**COUNT TWO**
**Fraud / Fraudulent Misrepresentation**
**(Kresimir Penavic Against Omar Khan, Sensei International LLC, and International Business & Wine Society LLC)**

136.   Plaintiff hereby repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

137.   Defendants Khan, Sensei, and International Business & Wine Society LLC made material misrepresentations to conceal or suppress material facts from Penavic. Such misrepresentations included:

    a.   Cancelling Business & Wine Events and rebooking them with attendees, with the representation that Khan would reschedule them or pay Plaintiff back;

    b.   False representations regarding various investment ventures including his claims that the third parties requested specified funds for events, that he invested the requested funds, that the events occurred with the third parties, and that the events produced profit;

    c.   False representations regarding the investment schemes with Daniel Rose, Peter Prescott, Mouton, and the IRS; and

    d.   False representations about the suddenly deceased accountant's management and control of bank accounts, and a with the IRS dispute that froze millions of dollars "overseas."

33

Case 1:20-cr-00117-PAE Document 33-2 Filed 06/04/24 Page 37 of 70

138.     The representations or omissions by Defendants Khan, Sensei, and International Business & Wine Society LLC were material and were false and misleading, and Khan knew they were material and were false and misleading at the time they were made or, at a minimum, acted with reckless disregard for the truth or falsity of the representations or omissions.

139.     Defendants Khan, Sensei, and International Business & Wine Society LLC misrepresented, concealed, or suppressed these facts with the intent to influence the actions of Penavic.

140.     Penavic reasonably and justifiably relied on Defendants' misrepresentations regarding all of these dealings, and his standing as an international consultant.

141.     At the time Penavic acted, Penavic was unaware of the concealed or suppressed facts and would have acted differently if Penavic had known the true facts.

142.     Defendants Khan, Sensei, and International Business & Wine Society LLC have not held the events that Penavic invested in or engaged the third parties that they claim to have requested the events.  As a result of Penavic's reliance upon Defendants Khan, Sensei, and International Business & Wine Society LLC's misrepresentations, Penavic has suffered damages in an amount to be proven at trial.

143.     By virtue of Defendants Khan, Sensei, and International Business & Wine Society LLC's willful, wanton, and morally culpable conduct, Penavic is entitled to recover at least $6,926,612, plus punitive damages in an amount to be determined at trial.

### COUNT THREE
### Unjust Enrichment
### (Kresimir Penavic Against Omar Khan, Sensei International, LLC, International Business & Wine Society LLC and Leslie Khan)

144.     Plaintiff Plaintiffs hereby repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

145.     Defendants Khan, Leslie Khan, Sensei, and International Business & Wine Society LLC were enriched at Plaintiff's expense by retaining the funds he "invested" in the fabricated investment schemes.  Defendants never had the intention of returning Penavic's funds.

146.     It is against equity and good conscience to permit Defendants to retain such funds, which were acquired through Defendants' dishonest actions.

147.     As a result, Defendants are liable in an amount to be determined at trial, but no less than $6,926,612.

**COUNT FOUR**
**Breach of Fiduciary Duty**
**(Kresimir Penavic Against Omar Khan and Sensei International, LLC)**

148.     Plaintiff Penavic hereby repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

149.     Defendants Khan and Sensei owed a fiduciary duty to Penavic as they were constantly advising Penavic and preforming transactions on his behalf.

150.     Penavic held a high level of reliance on Khan and Sensei for the investments, and Khan and Sensei were aware of this since they provided limited information regarding each investment, so Penavic had to rely upon their knowledge.

151.     Defendants Khan and Sensei exercised control over Penavic regarding these investments, and would manipulate the investment amounts required, although they were all fabricated.

152.     Defendants Khan and Sensei breached their duties to Penavic by fabricating the investments and instead, keeping the money for their own personal use.

153.    Defendants Khan and Sensei knowingly induced Penavic to participate in these ventures, even though they knew from the beginning that they were fraudulent and there was no likelihood of performance.

154.    Due to Defendants Khan and Sensei's breaches, Defendant Khan and Sensei International, LLC are liable in an amount to be determined at trial, but no less than $6,926,612.

### COUNT FIVE
### Aiding and Abetting Breach of Fiduciary Duty
### (Kresimir Penavic Against Leslie Khan)

155.    Plaintiff Penavic hereby repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

156.    Defendant Leslie Khan owed a fiduciary duty to Penavic as she was aware of his investment dealing and would and accept payment on Omar Khan's behalf.

157.    Penavic held a high level of reliance on Omar Khan and Leslie Khan for the investments, and Leslie Khan was aware of this since she and Khan provided limited information regarding each investment, so Penavic had to rely upon their knowledge.

158.    Defendant Leslie Khan exercised control over Penavic regarding these investments, and would verify Defendant Khan's excuses for nonpayment, although they were all fabricated.

159.    Defendant Leslie Khan breached her duty to Penavic by fabricating the excuses for nonpayment and instead, kept the funds for her own personal use.

160.    Defendant Leslie Khan knowingly induced Penavic to participate in these ventures, and to continue investing despite nonpayment even though she knew from the beginning that they were fraudulent and there was no likelihood of performance.

161.    Due to Defendant Leslie Khan's breaches, Defendant Leslie Khan is liable in an amount to be determined at trial.

**COUNT SIX**
**Aiding and Abetting Fraudulent Misrepresentation and Fraud**
**(Kresimir Penavic Against Leslie Khan)**

162.     Plaintiff Penavic hereby repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

163.     Defendant Omar Khan made material misrepresentations to and concealed or suppressed material facts from Penavic.

164.     The representations or omissions by Defendant Omar Khan and were material and were false and misleading, and Defendant Leslie Khan knew they were material and were false and misleading at the time they were made or, at a minimum, acted with reckless disregard for the truth or falsity of the representations or omissions.

165.     Defendant Omar Khan misrepresented, concealed, or suppressed these facts with the intent to influence the actions of Penavic.

166.     Penavic reasonably and justifiably relied on Defendant Leslie Khan's misrepresentations regarding all of these dealings, and Khan's standing as an international consultant.

167.     At the time Penavic acted, Penavic was unaware of the concealed or suppressed facts and would have acted differently if Penavic had known the true facts.

168.     Defendant Leslie Khan knew of the fraud by Defendant Omar Khan and Sensei International against Penavic as she was constantly privy to these business meetings and many dealings.

169.     Defendant Leslie Khan substantially assisted Omar Khan and Sensei in their fraud by helping to maintain the facade that Penavic was making legitimate business investments, while in reality she knew he was not.

Case 1:20-cr-00117-PAE    Document 33-2    Filed 06/04/24    Page 41 of 70

170.    As a result, Defendant Leslie Khan is liable in an amount to be determined at trial.

## COUNT SEVEN
### Violation of N.Y. General Business Law § 349: N.Y. Deceptive Trade Practices Act
### (Kresimir Penavic Against Omar Khan and Sensei International LLC)

171.    Plaintiff Penavic hereby repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

172.    Defendants Khan and Sensei's practice of making fraudulent misrepresentations to paying attendees of their wine and dinner events constitutes an unlawful and deceptive business act and practice.

173.    Defendants Khan and Sensei operated and sold reservations for wine and dinner events to the Penavic and as such was consumer-oriented in nature.

174.    Defendants Khan and Sensei marketed and sold the events by email and in-person in order to create the false impression that the event would occur, and that Penavic would attend the events that he paid and reserved a seat for.

175.    Defendants Khan and Sensei cancelled events without the intention to return funds to Penavic the events they cancelled.

176.    Defendants Khan and Sensei rebooked other customers at the events that Penavic had paid for and never returned the Penavic's funds.

177.    As a direct, proximate, and foreseeable result of Defendants Khan and Sensei's unlawful and deceptive business acts and practices, Penavic has been damaged in an amount not presently ascertainable in full and to be proven at trial.

## COUNT EIGHT
### Violation of N.Y. General Business Law § 350: False Advertising
### (Kresimir Penavic Against Omar Khan and Sensei International LLC)

Case 1:20-cr-00117-PAE   Document 33-2   Filed 06/04/24   Page 42 of 70

178.     Plaintiff Penavic hereby repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

179.     Defendants Khan and Sensei operated and sold reservations for wine and dinner events to Penavic and as such was consumer-oriented in nature.

180.     Defendants Khan and Sensei's practice of misleading paying attendees of their wine and dinner events was materially misleading.

181.      Defendants Khan and Sensei marketed and sold the events by email and in-person in order to create the false impression that the event would occur, and that Penavic would attend the events that he paid for and reserved a seat.

182.     Defendants Khan and Sensei cancelled events without the intention to return funds to Penavic for events they cancelled.

183.     Defendants Khan and Sensei rebooked other customers at the events that Penavic had paid for and never returned Penavic's funds.

184.     As a direct, proximate, and foreseeable result of Defendants Khan and Sensei's deceptive and materially misleading business acts and practices, Penavic has been damaged in an amount not presently ascertainable in full and to be proven at trial.

**COUNT NINE**
**Breach of Contract**
**(Dean Bernstein, Charles Curtis, Edward Kasselman, Mark Golodetz, Paul Gridley, Robert Van Brugge, Malcolm Thwaites, Miriam Tai, Robert Gelfond, Peter Slagowitz, Lorine Schaefer, and John Chapman Against Omar Khan and Sensei International LLC)**

185.     Plaintiffs Dean Bernstein, Charles Curtis, Edward Kasselman, Mark Golodetz, Paul Gridley, Robert Van Brugge, Malcolm Thwaites, Miriam Tai, Robert Gelfond, Peter Slagowitz,

Lorine Schaefer, and John Chapman hereby repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

186.     The agreements between Defendants Khan and Sensei, and Dean Bernstein, Charles Curtis, Edward Kasselman, Mark Golodetz, Paul Gridley, Robert Van Brugge, Malcolm Thwaites, Miriam Tai, Robert Gelfond, Peter Slagowitz, Lorine Schaefer, and John Chapman constituted legal and binding contracts.

187.     Plaintiffs Dean Bernstein, Charles Curtis, Edward Kasselman, Mark Golodetz, Paul Gridley, Robert Van Brugge, Malcolm Thwaites, Miriam Tai, Robert Gelfond, Peter Slagowitz, Lorine Schaefer, and John Chapman adequately performed under the agreements by investing as required.

188.      Defendants Khan and Sensei breached the contracts by failing to repay the above Plaintiffs Dean Bernstein, Charles Curtis, Edward Kasselman, Mark Golodetz, Paul Gridley, Robert Van Brugge, Malcolm Thwaites, Miriam Tai, Robert Gelfond, Peter Slagowitz, Lorine Schaefer, and John Chapman as required by the contracts despite the alleged success of events which required repayment of Plaintiffs' investments.

189.     As a result, Plaintiffs Dean Bernstein, Charles Curtis, Edward Kasselman, Mark Golodetz, Paul Gridley, Robert Van Brugge, Malcolm Thwaites, Miriam Tai, Robert Gelfond, Peter Slagowitz, Lorine Schaefer, and John Chapman were damaged $1,401,935 from Defendants Khan and Sensei's breaches.

## COUNT TEN
### Unjust Enrichment
**(Dean Bernstein, Charles Curtis, Edward Kasselman, Mark Golodetz, Paul Gridley, Robert Van Brugge, Malcolm Thwaites, Miriam Tai, Robert Gelfond, Peter Slagowitz, Lorine Schaefer, and John Chapman Against Omar Khan, Sensei International, LLC, and Leslie Khan)**

Case 1:20-cr-00117-PAE   Document 33-2   Filed 06/04/24   Page 44 of 70

190.     Plaintiffs Dean Bernstein, Charles Curtis, Edward Kasselman, Mark Golodetz, Paul Gridley, Robert Van Brugge, Malcolm Thwaites, Miriam Tai, Robert Gelfond, Peter Slagowitz, Lorine Schaefer, and John Chapman hereby repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

191.     Defendants Omar Khan, Sensei, and Leslie Khan was enriched at the expense of Plaintiffs Dean Bernstein, Charles Curtis, Edward Kasselman, Mark Golodetz, Paul Gridley, Robert Van Brugge, Malcolm Thwaites, Miriam Tai, Robert Gelfond, Peter Slagowitz, Lorine Schaefer, and John Chapman by retaining the funds they had the Plaintiffs "invest" in fabricated investment schemes.  Defendants never had the intention of returning Plaintiffs' funds.

192.     It is against equity and good conscience to permit Defendants Omar Khan, Sensei, and Leslie Khan to retain such funds, which were acquired through their dishonest actions.

193.     It is against equity and good conscience to permit Defendants Omar Khan, Sensei, and Leslie Khan to retain such funds, which were acquired through their dishonest actions.

194.     As a result, Defendants Omar Khan, Sensei, and Leslie Khan are liable to Plaintiffs Dean Bernstein, Charles Curtis, Edward Kasselman, Mark Golodetz, Paul Gridley, Robert Van Brugge, Malcolm Thwaites, Miriam Tai, Robert Gelfond, Peter Slagowitz, Lorine Schaefer, and John Chapman in an amount to be determined at trial, but no less than $1,401,935.

**WHEREFORE**, Plaintiffs request that this Court enter judgments against all Defendants as follows:

1.    Awarding compensatory damages in an amount to be determined at trial but not less than $8,324,796 as detailed in the attached Schedule 1, plus accrued interest;

     a.   consequential damages in an amount to be determined at trial;

41

Case 1:20-cr-00117-PAE   Document 33-2   Filed 06/04/24   Page 45 of 70

b.   attorneys' fees and costs;

c.   punitive damages; and

d.   such other and further relief as the Court may deem equitable and proper.

Date:   New York, New York
        September 3, 2019

/s/***Dov B. Gold***_____
Dov B. Gold, Esq.
Attorneys for Plaintiffs
The Seiden Group, LLP
469 Seventh Avenue, Suite 502
New York, NY 10018
(646) 776-1703
dgold@seidenlegal.com

42

Case 1:20-cr-00117-PAE   Document 33-2   Filed 06/04/24   Page 46 of 70

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

KRESIMIR PENAVIC, DEAN BERNSTEIN,
CHARLES CURTIS, EDWARD KASSELMAN,
MARK GOLODETZ, PAUL GRIDLEY, ROBERT
VAN BRUGGE, MALCOLM THWAITES, MIRIAM
TAI, ROBERT GELFOND, PETER SLAGOWITZ,
LORINE SCHAEFER, and JOHN CHAPMAN,

        Plaintiffs,

        -against-

OMAR KHAN, LESLIE KHAN, SENSEI
INTERNATIONAL, LLC, and INTERNATIONAL
BUSINESS & WINE SOCIETY LLC,

        Defendants.

**VERIFICATION**

KRESIMIR PENAVIC, being duly sworn, deposes and states:

1. I am a Plaintiff in the above-entitled action.

2. I am fully familiar with the facts and circumstances of this matter.

3. I have read the foregoing Complaint, and know the contents thereof. The factual contents
of the same that pertain to me are true to my own knowledge, except as to matters stated therein
upon information and belief, and to those matters, I believe them to be true.

Kresimir Penavic

Sworn to before me this 26
day of August, 2019

Notary Public

STEPHEN J. DEMAIO
NOTARY PUBLIC, State of New York
No. 01DE4919049
Qualified In Suffolk County
Commission Expires Feb. 1, 2022

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| KRESIMIR PENAVIC, DEAN BERNSTEIN, CHARLES CURTIS, EDWARD KASSELMAN, MARK GOLODETZ, PAUL GRIDLEY, ROBERT VAN BRUGGE, MALCOLM THWAITES, MIRIAM TAI, ROBERT GELFOND, PETER SLAGOWITZ, LORINE SCHAEFER, and JOHN CHAPMAN,<br><br>     Plaintiffs,<br><br>      -against-<br><br>OMAR KHAN, LESLIE KHAN, SENSEI INTERNATIONAL, LLC, and INTERNATIONAL BUSINESS & WINE SOCIETY LLC,<br><br>     Defendants. | Commercial Division<br><br>Index No. 655058/2019<br><br>**DEFAULT JUDGMENT**<br><br>Rendered in Favor of Plaintiffs<br><br>**Hon. Joel M. Cohen** |

| | |
|---|---|
| Total amount awarded after Default Judgment | $6,168,732.00 |
| Total Interest | $1,904,324.35 |
| Cost by Statute | $    Waived |
| Service of Summons and Complaint | $    Waived |
| Filing of Summons and Complaint | $    Waived |
| Prospective Marshal's Fee | $    Waived |
| Filing of Notice of Trial | $    Waived |

Total Judgment Amount against all Defendants with Prejudgment Interest $8,073,056.35

      This action having been duly commenced by the service of a Summons and Complaint

against Defendants, and Plaintiffs appearing by their counsel, Seiden Law Group, LLP, which

has an office at 322 Eighth Avenue, Suite 1704, New York, NY 10001 (Tel. 646.766.1703), and

Defendants having appeared by counsel and subsequently defaulted, and Justice Joel M. Cohen

having issued an order granting Plaintiffs' motion for a default judgment as to liability, and

directing Plaintiffs to submit a proposed judgment to the Court (with signature lines for the

Court and the Clerk), with support for sum certain damages amounts for each Plaintiff, supported

by the record, and dates from which prejudgment interest should be calculated by the Clerk;

NOW, on the application of Plaintiffs' attorney, Dov Gold, of the law firm of Seiden Law Group, LLP, it is,

**ADJUDGED** that each of the Plaintiffs shall have judgment and recover from Defendant Omar Khan, Defendant Leslie Khan, Defendant Sensei International, LLC ("**Sensei**"), and Defendant International Business & Wine Society LLC, in the sums described below with prejudgment statutory interest at the rate of 9% from the applicable date, as calculated by the Clerk in the amount described below through September 15, 2021, and postjudgment statutory interest at the rate of 9%, without costs and disbursements, which Plaintiffs waive, and that the Plaintiffs have execution therefor.

**Plaintiff Dean Bernstein**

| Plaintiff | Defendants[1] | Sum Certain (and Description) | Date of Breach | Cite |
|---|---|---|---|---|
| Dean Bernstein | Omar Khan, Sensei - (Breach of Contract - Count 9)<br><br>Leslie Khan (Unjust Enrichment - Count 10) | $25,000.00<br><br>This is the actual amount that Dean Bernstein invested; no portion of this amount was ever repaid. | 2/26/2019 | *See* Dkt. 44 (Affidavit of Dean Bernstein) at 5, 6; Dkt. 2 at 47, 61. |

Amount awarded after Default Judgment   $25,000.00
Interest from February 26, 2019         $  5745.21
Cost by Statute                         $     Waived

---

[1]    Where two defendants are listed in any particular row on this chart or the following charts, the defendants are each liable for the damages shown.

| | | | |
|---|---|---|---|
| Service of Summons and Complaint | $ | Waived | |
| Filing of Summons and Complaint | $ | Waived | |
| Prospective Marshal's Fee | $ | Waived | |
| Filing of Notice of Trial | $ | Waived | |
| Total Judgment Amount | $30,745.21 | | |

## Plaintiff John Chapman

| Plaintiff | Defendants | Sum Certain (and Description) | Date of Breach | Cite |
|---|---|---|---|---|
| John Chapman | Omar Khan, Sensei - (Breach of Contract - Count 9) Leslie Khan (Unjust Enrichment - Count 10) | $57,200.00 This is the actual amount that John Chapman invested; no portion of this amount was ever repaid. | 3/26/2019 | *See* Dkt. 45 (Affidavit of John Chapman) at 5, 6; Dkt. 2 at 58. |

| | | |
|---|---|---|
| Amount awarded after Default Judgment | $57,200.00 | |
| Interest from March 26, 2019 | $ 12,750.12 | |
| Cost by Statute | $ | Waived |
| Service of Summons and Complaint | $ | Waived |
| Filing of Summons and Complaint | $ | Waived |
| Prospective Marshal's Fee | $ | Waived |
| Filing of Notice of Trial | $ | Waived |
| Total Judgment Amount | $69,950.12 | |

## Plaintiff Mark Golodetz

| Plaintiff | Defendants | Sum Certain (and Description) | Cite |
|---|---|---|---|

| Mark Golodetz | Omar Khan - (Breach of Contract - Count 9) | $6,800.00 in unpaid interest on prior investments for which the principal balance had been repaid. | *See* Dkt. 47 (Affidavit of Mark Golodetz) at 5; Dkt. at 50, 61. |
|---|---|---|---|

Amount awarded after Default Judgment    $6,800.00
Interest                                 $    Waived
Cost by Statute                          $    Waived
Service of Summons and Complaint         $    Waived
Filing of Summons and Complaint          $    Waived
Prospective Marshal's Fee                $    Waived
Filing of Notice of Trial                $    Waived
Total Judgment Amount          **$6,800**

**Plaintiff Paul Gridley**

| Plaintiff | Defendants | Sum Certain (and Description) | Date of Breach | Cite |
|---|---|---|---|---|
| Paul Gridley | Omar Khan, Sensei - (Breach of Contract - Count 9)<br><br>Leslie Khan (Unjust Enrichment - Count 10) | $39,580.00<br><br>This is the actual amount of Paul Gridley's March 2018 investment of $50,000.00 that was | 6/30/2019 | *See* Dkt. 48 (Affidavit of Paul Gridley) at 5, 6; Dkt. 2 at 51, 61. |

| | | | | |
|---|---|---|---|---|
| | | never returned. | | |
| Paul Gridley | Omar Khan, Sensei - (Breach of Contract - Count 9)<br><br>Leslie Khan (Unjust Enrichment - Count 10) | $32,000.00<br><br>This is the actual amount of Paul Gridley's February 2019 investment; no portion of this amount was ever repaid.[2] | 2/26/2019 | *See* id. |
| Paul Gridley | Omar Khan, Sensei - (Breach of Contract - Count 9)<br><br>Leslie Khan (Unjust Enrichment - Count 10) | $16,000.00<br><br>This is the actual amount of Paul Gridley's March 2019 investment; no portion of this amount was ever repaid. | 4/2/2019 | *See* id. |

Amount awarded after Default Judgment   $87,580.00
Interest from June 30, 2019   $ 7885.64
Interest from February 26, 2019   $ 7353.86
Interest from April 2, 2019   $ 3538.85
Cost by Statute   $   Waived
Service of Summons and Complaint   $   Waived

---

[2] The Complaint indicates this amount was $28,750; the Affidavit of Paul Gridley corrected this number to $32,000.

| | | |
|---|---|---|
| Filing of Summons and Complaint | $ | Waived |
| Prospective Marshal's Fee | $ | Waived |
| Filing of Notice of Trial | $ | Waived |
| Total Judgment Amount | $106,358.35 | |

**Plaintiff Edward Kasselman**

| Plaintiff | Defendants | Sum Certain (and Description) | Date of Breach | Cite |
|---|---|---|---|---|
| Edward Kasselman | Omar Khan - Investment (Breach of Contract - Count 9)<br><br>Leslie Khan, Sensei[3] (Unjust Enrichment - Count 10) | $8,000.00<br><br>This is the actual amount that Edward Kasselman paid for a March 2019 event; no portion of this amount was ever repaid. | 5/21/2019 | See Dkt. 49 (Affidavit of Edward Kasselman) at 5, 6; Dkt. 2 at 49. |

| | | |
|---|---|---|
| Amount awarded after Default Judgment | $8,000.00 | |
| Interest from May 21, 2019 | $ 1672.77 | |
| Cost by Statute | $ | Waived |
| Service of Summons and Complaint | $ | Waived |
| Filing of Summons and Complaint | $ | Waived |
| Prospective Marshal's Fee | $ | Waived |
| Filing of Notice of Trial | $ | Waived |
| Total Judgment Amount | $9672.77 | |

---

[3] In the motion for default judgment, Plaintiffs inadvertently characterized relief sought by Plaintiff Edward Kasselman against Sensei International, LLC as breach of contract when it is unjust enrichment as detailed in Plaintiff Edward Kasselman's affidavit.

**Plaintiff Kresimir Penavic**

| Plaintiff | Defendants | Sum Certain (and Description) | Date of Breach | Cite |
|---|---|---|---|---|
| Kresimir Penavic | Omar Khan, Sensei - (Breach of Contract - Count 1)<br><br>IBWSLLC, Leslie Khan (Unjust Enrichment - Count 3) | $4,946,102.00<br><br>This is the actual amount that Kresimir Penavic invested from June 2015 to March 2018; no portion of this amount was ever repaid. | 3/19/2018 | *See* Dkt. 56 (Affidavit of Kresimir Penavic) at 16, 17; Dkt. 2 at 41, 111, 119; Dkt. 3; Dkt. 3. |

| | |
|---|---|
| Amount awarded after Default Judgment | $4,946,102.00 |
| Interest from March 19, 2018 | $1,556,192.75 |
| Cost by Statute | $    Waived |
| Service of Summons and Complaint | $    Waived |
| Filing of Summons and Complaint | $    Waived |
| Prospective Marshal's Fee | $    Waived |
| Filing of Notice of Trial | $    Waived |
| Total Judgment Amount | $6,502,294.75 |

**Plaintiff Lorine Schaefer**

| Plaintiff | Defendants | Sum Certain (and Description) | Date of Breach | Cite |
|---|---|---|---|---|
| Lorine Schaefer | Omar Khan, Sensei - (Breach of Contract - Count 9) | $36,050.00<br><br>This is the actual | 3/26/2019 | *See* Dkt. 50 (Affidavit of Lorine Schaefer) at 5, |

Case 1:20-cr-00117-PAE   Document 33-2   Filed 06/04/24   Page 54 of 70

| | Leslie Khan (Unjust Enrichment - Count 10) | amount that Lorine Schaefer invested in December 2018; no portion of this amount was ever repaid. | | 6; Dkt. 2 at 57. |
|---|---|---|---|---|

Amount awarded after Default Judgment      $36,050.00
Interest from March 26, 2019               $ 8035.69
Cost by Statute                            $      Waived
Service of Summons and Complaint           $      Waived
Filing of Summons and Complaint            $      Waived
Prospective Marshal's Fee                  $      Waived
Filing of Notice of Trial                  $      Waived
Total Judgment Amount          $44,085.69

**Plaintiff Peter Slagowitz**

| Plaintiff | Defendants | Sum Certain (and Description) | Date of Breach | Cite |
|---|---|---|---|---|
| Peter Slagowitz | Omar Khan, Sensei - (Breach of Contract - Count 9)

Leslie Khan (Unjust Enrichment - Count 10) | $45,000.00

This is the actual amount of Peter Slagowitz's investment of $50,000.00 that was | 1/29/2019 | *See* Dkt. 52 (Affidavit of Peter Slagowitz) at 5, 6; Dkt. 2 at 56; Dkt. 3. |

| | | never returned. | | |
|---|---|---|---|---|

Amount awarded after Default Judgment    $45,000.00
Interest from January 29, 2019    $10,652.05
Cost by Statute    $    Waived
Service of Summons and Complaint    $    Waived
Filing of Summons and Complaint    $    Waived
Prospective Marshal's Fee    $    Waived
Filing of Notice of Trial    $    Waived
Total Judgment Amount    $55,652.05

## Malcolm Thwaites

| Plaintiff | Defendants | Sum Certain (and Description) | Date of Breach | Cite |
|---|---|---|---|---|
| Malcolm Thwaites | Omar Khan, Sensei - (Breach of Contract - Count 9)<br><br>Leslie Khan (Unjust Enrichment - Count 10) | $18,000.00<br><br>This is the actual amount that Malcolm Thwaites invested in January 2018; no portion of this amount was ever repaid. | 1/30/2018 | *See* Dkt. 54 (Affidavit of Malcolm Thwaites) at 6-8;<br>Dkt. 2 at 53, 61; Dkt. 3. |
| Malcolm Thwaites | Omar Khan, Sensei - (Breach of Contract - Count 9) | $45,000.00<br><br>This is the actual amount that Malcolm | 9/19/2018 | *See id.* |

| | | | | |
|---|---|---|---|---|
| | Leslie Khan (Unjust Enrichment - Count 10) | Thwaites invested in September 2018; no portion of this amount was ever repaid. | | |
| Malcolm Thwaites | Omar Khan, Sensei - (Breach of Contract - Count 9)  Leslie Khan (Unjust Enrichment - Count 10) | $57,000.00  This is the actual amount that Malcolm Thwaites invested in October 2018; no portion of this amount was ever repaid. | 10/15/2018 | *See id.* |
| Malcolm Thwaites | Omar Khan, Sensei - (Breach of Contract - Count 9)  Leslie Khan (Unjust Enrichment - Count 10) | $23,000.00  This is the actual amount that Malcolm Thwaites invested in June 2018; no portion of this amount was ever repaid. | 6/15/2018 | *See id.* |

Amount awarded after Default Judgment    $143,000.00
Interest from January 30, 2018    $ 5876.38
Interest from September 19, 2018    $ 12,116.71

Case 1:20-cr-00117-PAE   Document 33-2   Filed 06/04/24   Page 57 of 70

| | | |
|---|---|---|
| Interest from October 15, 2018 | $ | 14,982.41 |
| Interest from June 15, 2018 | $ | 6737.42 |
| Cost by Statute | $ | Waived |
| Service of Summons and Complaint | $ | Waived |
| Filing of Summons and Complaint | $ | Waived |
| Prospective Marshal's Fee | $ | Waived |
| Filing of Notice of Trial | $ | Waived |
| Total Judgment Amount | $182,712.92 | |

**Plaintiff Robert Van Brugge**

| Plaintiff | Defendants | Sum Certain (and Description) | Date of Breach | Cite |
|---|---|---|---|---|
| Robert Van Brugge | Omar Khan, Sensei - Investment (Breach of Contract - Count 9)<br><br>Leslie Khan (Unjust Enrichment - Count 10) | $65,000.00<br><br>This is the actual amount that Robert Van Brugge invested on April 27, 2018; no portion of this amount was ever repaid. | 6/4/2018 | *See* Dkt. 55 (Affidavit of Robert Van Brugge) at 3, 4; Dkt. 2 at 52, 61; Dkt. 3. |
| Robert Van Brugge | Omar Khan, Sensei - Investment (Breach of Contract - Count 9)<br><br>Leslie Khan (Unjust Enrichment - Count 10) | $35,000.00<br><br>This is the actual amount Robert Van Brugge invested in his first May 2018 investment; | 5/15/2018 | *See id.* |

| | | no portion of this amount was ever repaid. | | |
|---|---|---|---|---|
| Robert Van Brugge | Omar Khan, Sensei - Investment (Breach of Contract - Count 9) Leslie Khan (Unjust Enrichment - Count 10) | $32,500.00 This is the actual amount Robert Van Brugge invested in his second May 2018 investment; no portion of this amount was ever repaid. | 11/1/2018 | *See* id. |
| Robert Van Brugge | Omar Khan, Sensei - Investment (Breach of Contract - Count 9) Leslie Khan (Unjust Enrichment - Count 10) | $69,000.00 This is the actual amount that Robert Van Brugge invested on April 18, 2018; no portion of this amount was ever repaid. | 3/2/2019 | *See* id. |
| Robert Van Brugge | Omar Khan, Sensei - Investment (Breach of Contract - Count 9) | $13,000.00 This is the actual amount that Robert Van Brugge | 6/14/2018 | *See* id. |

| | | | | |
|---|---|---|---|---|
| | Leslie Khan (Unjust Enrichment - Count 10) | invested in June 2018; no portion of this amount was ever repaid. | | |

| | |
|---|---|
| Amount awarded after Default Judgment | $214,500.00 |
| Interest from June 4, 2018 | $  19,216.85 |
| Interest from May 15, 2018 | $  10,520.14 |
| Interest from November 1, 2018 | $   8406.37 |
| Interest from March 2, 2019 | $  15,788.71 |
| Interest from June 14, 2018 | $   3811.32 |
| Cost by Statute | $   Waived |
| Service of Summons and Complaint | $   Waived |
| Filing of Summons and Complaint | $   Waived |
| Prospective Marshal's Fee | $   Waived |
| Filing of Notice of Trial | $   Waived |
| Total Judgment Amount        $272,243.39 | |

**Plaintiff Miriam Tai**

| Plaintiff | Defendants | Sum Certain (and Description) | Date of Breach | Cite |
|---|---|---|---|---|
| Miriam Tai | Omar Khan, Sensei - Investment (Breach of Contract - Count 9)  Leslie Khan (Unjust Enrichment - Count 10) | $6,000.00  This is the actual amount of Miriam Tai's March 6, 2018 investment of $27,500 that was never returned. | 3/6/2018 | *See* Dkt. 53 (Affidavit of Miriam Tai) at 5-7; Dkt. 3. |

| Miriam Tai | Omar Khan, Sensei - Investment (Breach of Contract - Count 9)<br><br>Leslie Khan (Unjust Enrichment - Count 10) | $60,000.00<br><br>This is the actual amount that Miriam Tai invested on March 12, 2018; no portion of this amount was ever repaid. | 3/12/2018 | *See* id. |
|---|---|---|---|---|
| Miriam Tai | Omar Khan, Sensei - Investment (Breach of Contract - Count 9)<br><br>Leslie Khan (Unjust Enrichment - Count 10) | $40,000.00<br><br>This is the actual amount that Miriam Tai invested in December 2017; no portion of this amount was ever repaid. | 4/5/2018 | *See* id. |
| Miriam Tai | Omar Khan, Sensei - Investment (Breach of Contract - Count 9)<br><br>Leslie Khan (Unjust Enrichment - Count 10) | $75,000.00<br><br>This is the actual amount that Miriam Tai invested on April 9, 2018; no portion of this amount was ever repaid. | 4/9/2018 | *See* id. |

| Miriam Tai | Omar Khan, Sensei - Investment (Breach of Contract - Count 9)  Leslie Khan (Unjust Enrichment - Count 10) | $50,000.00  This is the actual amount that Miriam Tai invested in June 2018; no portion of this amount was ever repaid. | 6/4/2018 | *See* id. |
| Miriam Tai | Omar Khan, Sensei - Investment (Breach of Contract - Count 9)  Leslie Khan (Unjust Enrichment - Count 10) | $47,500.00  This is the actual amount that Miriam Tai invested in March 2019; no portion of this amount was ever repaid. | 3/2/2019 | *See* id. |

| | |
|---|---|
| Amount awarded after Default Judgment | $278,500.00 |
| Interest from March 6, 2018 | $   1907.01 |
| Interest from March 12, 2018 | $  18,981.37 |
| Interest from April 5, 2018 | $  12,417.53 |
| Interest from April 9, 2018 | $  23,208.90 |
| Interest from June 4, 2018 | $  14,782.19 |
| Interest from March 2, 2019 | $  10,869.04 |
| Cost by Statute | $   Waived |
| Service of Summons and Complaint | $   Waived |
| Filing of Summons and Complaint | $   Waived |
| Prospective Marshal's Fee | $   Waived |
| Filing of Notice of Trial | $   Waived |
| Total Judgment Amount | $360,666.04 |

**Plaintiff Robert Gelfond**

| Plaintiff | Defendants | Sum Certain (and Description) | Date of Breach | Cite |
|---|---|---|---|---|
| Robert Gelfond | Omar Khan, Sensei - Investment (Breach of Contract - Count 9)<br><br>Leslie Khan (Unjust Enrichment - Count 10) | $241,000.00<br><br>This is the actual amount of Robert Gelfond's August 2017 investment of $250,000 that was never returned. | 10/31/2017 | *See* Dkt. 51 (Affidavit of Robert Gelfond) at 5-7; Dkt. 2 at 61; Dkt. 3. |
| Robert Gelfond | Omar Khan, Sensei - Investment (Breach of Contract - Count 9)<br><br>Leslie Khan (Unjust Enrichment - Count 10) | $75,000.00<br><br>This is the actual amount that Robert Gelfond invested in September 2017; no portion of this amount was ever repaid. | 11/30/2017 | *See* id. |

| | |
|---|---|
| Amount awarded after Default Judgment | $316,000.00 |
| Interest from October 31, 2017 | $ 84,085.89 |
| Interest from November 30, 2017 | $ 25,613.01 |
| Cost by Statute | $     Waived |
| Service of Summons and Complaint | $     Waived |
| Filing of Summons and Complaint | $     Waived |
| Prospective Marshal's Fee | $     Waived |
| Filing of Notice of Trial | $     Waived |
| Total Judgment Amount | $425,698.90 |

X

**Plaintiff Charles Curtis**

| Plaintiff | Defendants | Sum Certain (and Description) | Date of Breach | Cite |
|---|---|---|---|---|
| Charles Curtis | Omar Khan - Investment (Breach of Contract - Count 9)<br><br>Leslie Khan, Sensei[4] (Unjust Enrichment - Count 10) | $5,000.00<br><br>This is the amount due under a February 2019 invoice for consulting services that Mr. Curtis provided to Defendant Khan. | 2/4/2019 | *See* Dkt. 46 (Affidavit of Charles Curtis) at 5-6; Dkt. 2 at 48, 61; Dkt. 3. |

| | |
|---|---|
| Amount awarded after Default Judgment | $5,000.00 |
| Interest from February 4, 2019 | $ 1176.16 |
| Cost by Statute | $   Waived |
| Service of Summons and Complaint | $   Waived |
| Filing of Summons and Complaint | $   Waived |
| Prospective Marshal's Fee | $   Waived |
| Filing of Notice of Trial | $   Waived |
| X   Total Judgment Amount | $6176.16 |

Judgment signed this  21 st  day of March, 2022.

_____
Joel M. Cohen, J.S.C.

_____
CLERK

FILED
Mar 23 2022
NEW YORK
COUNTY CLERK'S OFFICE

---

[4] In the motion for default judgment, Plaintiffs inadvertently characterized relief sought by Plaintiff Charles Curtis against Sensei International, LLC as breach of contract when it is unjust enrichment as detailed in Plaintiff Charles Curtis' affidavit.

Case 1:20-cr-00117-PAE   Document 33-2   Filed 06/04/24   Page 64 of 70

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

KRESIMIR PENAVIC, DEAN BERNSTEIN,
CHARLES CURTIS, EDWARD KASSELMAN,
MARK GOLODETZ, PAUL GRIDLEY, ROBERT
VAN BRUGGE, MALCOLM THWAITES, MIRIAM
TAI, ROBERT GELFOND, PETER SLAGOWITZ,
LORINE SCHAEFER, and JOHN CHAPMAN,

       Plaintiffs,

       -against-

OMAR KHAN, LESLIE KHAN, SENSEI
INTERNATIONAL, LLC, and INTERNATIONAL
BUSINESS & WINE SOCIETY LLC,

       Defendants.

Commercial Division

Index No. 655058/2019

**AFFIRMATION OF DOV GOLD**

**Hon. Joel M. Cohen**

       DOV GOLD, an attorney duly admitted to practice before the courts of the State of

New York, affirms the following under the penalties of perjury:

       1.      I am an Associate at Seiden Law Group, LLP, attorneys for Plaintiffs in the above-

captioned matter.

       2.      The addresses for Plaintiffs are as follows:

Kresimir Penavic
106 McCauley Avenue
Pocono Pines, PA 18350

Dean Bernstein
35 Alta Vista Circle
Irvington, NY 10533

Charles Curtis
10 West 66th Street #22H
New York, NY 10023

Edward Kasselman
1607 Frazee Drive

Manasquan, NJ 08736

Mark Golodetz
816 Sleepy Hollow Road
Briarcliff Manor, NY 10510

Paul Gridley
356 East 69th Street
New York, NY 10021

Robert van Brugge
200 East 79th Street #7B
New York, NY 10075

Malcolm Thwaites
Garnet House
31 Camp Road
London
SW19 4UW
UK

Miriam Tai
242 East 25th Street
Apt 11A
New York, NY 10010

Robert Gelfond
45 East 25th Street #39B
New York, NY 10010

Peter Slagowitz
201 W 86th Street Apt 206
New York, NY 10024

Lorine Schaefer
45 W 60th Street
Apt 19E
New York, NY 10023

John Chapman
80 Grennan Road
West Hartford, CT 06107

      3.        The last known addresses for Defendants are as follows:

Omar Khan
111 East 56th Street, Apartment 1200

Case 1:20-cr-00117-PAE   Document 33-2   Filed 06/04/24   Page 66 of 70

New York, New York 10022

Leslie Khan
111 East 56th Street, Apartment 1200
New York, New York 10022

Sensei International, LLC
445 Park Avenue
New York, New York 10022

International Business & Wine Society LLC
16192 Coastal Highway
Lewes, Delaware 19958-9776

Dated: March 14, 2022
        New York, New York

**F I L E D**

**Mar 23 2022**

NEW YORK
COUNTY CLERK'S OFFICE

*/s/ Dov Gold*
Dov Gold

Case 1:20-cr-00117-PAE    Document 33-2    Filed 06/04/24    Page 67 of 70

*Index No.* 655058/2019

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

KRESIMIR PENAVIC, DEAN BERNSTEIN,
CHARLES CURTIS, EDWARD KASSELMAN,
MARK GOLODETZ, PAUL GRIDLEY,
ROBERT VAN BRUGGE, MALCOLM THWAITES,
MIRIAM TAI, ROBERT GELFOND,
PETER SLAGOWITZ, LORINE SCHAEFER,
and JOHN CHAPMAN,

Plaintiffs,

- against -

OMAR KHAN, LESLIE KHAN,
SENSEI INTERNATIONAL, LLC, and
INTERNATIONAL BUSINESS & WINE SOCIETY LLC,

Defendants.

---

**JUDGMENT**

---

13 – 4
**FILED AND
DOCKETED**
Mar 23 2022
AT        11:53 A      M
N.Y. CO. CLK'S OFFICE

**SEIDEN LAW GROUP, LLP**

*Attorneys for* Plaintiffs

322 EIGHTH AVENUE, SUITE 1704
NEW YORK, NY 10001
TEL. 646.766.1703

---

**From:** oksensei < ████████████████████ >

**Subject: Omar Here**

**Date:** January 9, 2023 at 05:14:16 GMT+1

**To:** ████████████████████████████████ >

Hi ████████,

It has of course been far too long. When the "article" came out, I was advised to contact no one, to speak to no one. And of course, in one fell swoop the characterization presented there meant any dinners or wine in the pipeline became toxic or just collapsed. So the only wherewithal, by which any repayments could have been staged, disappeared.

As there was no stockpile of money -- the funds truly went to trying to bring these various things to fruition -- the only thing, literally we could do is to go to a past business base.

Sri Lanka was never about "fleeing" as it has extradition. When we left, there was no criminal complaint, and so our departure, we were legally advised was fully legal and we could go anywhere we wished.

Devastated by what had been wrought, the aim was to marshal the consulting relationships here and generate something by which that could start to be addressed, even incrementally.

Of course, COVID hit, and everything collapsed, literally. I became a COVID researcher and commentator. A debt riddled third world country is not where you want to be in a global pandemic. But I wrote at length, researched, and did what we could to bring global expertise to bear here.

We had no funds to even procedurally defend ourselves in the litigation, and painstakingly just devoted ourselves to being of service here.

As I write we were recently served with an extradition order when until October 18th 2022, I had no idea anything beyond the civil litigation was being undertaken, as no one had ever contacted us on that front. I have been a public figure here, so very visible for years.

Our business helps grass roots communities with life skills, we have segued into building leadership capability amongst sustainability initiatives. We are helping Sri Lanka to try to get its tourism back on track after the country went bankrupt.

Angry as you must be from your perspective, I believe, overall, you would  be happy and gratified, both of you, with the fact that we have been engaged in building up human capital here.

No fancy wines (they have none), working with Chefs and others yes, to build capabilities on the hospitality front. Again, I think you would be impressed by some of what we've helped them produce.

So I have to humbly ask for some compassion. I know your own commitment to Croatia. Sri Lanka is like that to us. If you truly believe the world would be a better place for me to be punished in a way that destroys all of that, versus being able to build on what we've done here to date, so be it.

It seems we have been blessed to productively be able to demonstrate some of the contrition called for, having failed in what we tried to create, by my diving into a life of teaching, management consulting, providing gratis support to front line doctors and nurses on "psychological first aid" from our earlier coaching work, and helping businesses survive here.

I would love you to come and see for yourselves. But to the extent that "an eye for an eye leaves the whole world blind" and given that you may have thought we're plundering people and cynically gloating (anything but at any time truly!), I thought you should be aware of where my life has evolved and what we have been seeking to contribute.

Youngsters I coached during the civil war here in the 90s are now senior managers and leaders, and the joy in their sharing what they gained from that development is truly intoxicating. And we could generate affidavits galore in that vein.

I had no idea of where those seeds had fallen, until when we arrived, humiliated and broke, we were met with grateful love. However imperfectly, I have sought to be worthy of that since, at least to some extent.

Please consider that in the overall equity of the situation and what impact matters most in the here and now. However it came to pass, we have been somewhat needed catalysts here over these tragic and tumultuous times.

And if global pandemics and national bankruptcies will allow us a breather, we can indeed start generating some surpluses, though foreign exchange is not allowed to be remitted currently, we do what we can. But there are large businesses who we hope can again one day properly operate here again and in this region.

It was in that spirit, the mediator from South Africa reached out, in the hope that we might through a dialogue agree a more positive sum way forward. I would be truly grateful to have the gift of that opportunity for everyone's sake.

OK

PS. One day, in my delirium I think, I would love to properly compose an evening together once more. There were some grand moments shared I will always cherish. But grander still has been the opportunity to serve here. And it is in that spirit, I ask you to please consider what would be "victory" in the scheme of things. Thank you.

You may not want them, but you and ███████ will both always have our genuine prayers for your wellbeing and happiness.